GEORGE T. BLANCHETTE, APPELLEE, V. KEITH COUNTY BANK &
TRUST COMPANY, A NEBRASKA BANKING CORPORATION,
APPELLANT.
437 N.W.2d 488

Filed March 31, 1989.   No. 87-515.

Neil E. Williams and Tanya L. Dillow, of McGinley, Lane, Mueller, O'Donnell & Williams, P.C., for appellant.

David T. Schroeder for appellee.

William B. Brandt and Robert J. Hallstrom, of Brandt, Horan, Hallstrom and Sedlacek, for amicus curiae Nebraska Bankers Association, Inc.

HASTINGS, C.J., WHITE, CAPORALE, and FAHRNBRUCH, JJ., and COADY, D.J.

CAPORALE, J.

In this action for conversion, the defendant, Keith County Bank & Trust Company, appeals the $11,134 judgment entered against it pursuant to the verdict in favor of plaintiff-appellee, George T. Blanchette. Defendant bank assigns as error the district court's (1) finding that the evidence supports the verdict, (2) overruling of its motion in limine, and (3) refusal to charge the jury with an instruction it requested. We affirm.

## I. THE EVIDENCE

Blanchette is the sole shareholder and president of Consumers Protective Insurance Agency Limited, a corporation through which he sells insurance. He is also the assignee of Consumers' interests in the subject matter of this litigation. In 1985, Consumers consigned a 1983 Cadillac automobile it owned to Fuller Motor Company, Inc., for sale. Fuller Motor sold the automobile, and the buyer financed the purchase through General Motors Acceptance Corporation. As a result, General Motors wrote a check to Fuller Motor in the sum of $11,134, which Fuller Motor, on April 8, 1985, placed in its checking account with defendant bank as part of a $17,693.55 deposit.

Blanchette in turn went to the First National Bank of Ogallala, which held a lien on Consumers' automobile, to retrieve the title and deliver it to Fuller Motor. First National agreed, through its employee Doug Teaford, to release the lien noted on the certificate of title to the automobile in exchange for the money Blanchette was to receive from Fuller Motor. On April 5, 1985, Blanchette took the title to Fuller Motor and received a check in the sum of $11,600 drawn on Fuller Motor's account with defendant bank payable to Blanchette's order. Blanchette then endorsed the check over to First National to apply on Consumers' indebtedness on the lien.

First National presented the check for payment, which was returned to it unpaid by defendant bank on April 9, 1985, with the notation "refer to maker." On April 10, defendant bank debited the full amount in Fuller Motor's account, $39,695.96, and applied that sum to the two notes payable executed by Fuller Motor in favor of defendant bank. Defendant bank's answer admits that on April 9, 1985, Fuller Motor's account

contained funds sufficient to cover its check to Blanchette. Nonetheless, defendant bank's officers decided during the course of that morning to dishonor the check, but did not actually set off against Fuller Motor's account until sometime the next day.

On April 9, First National called Blanchette and informed him the check had been returned. Sometime that same week, Blanchette called defendant bank and was told that "they had returned the check because there was no longer any, going to be any money in [Fuller Motor's] account . . . ." Defendant bank further told Blanchette "[t]hey were going to offset all of [Fuller Motor's] account balance against debt that Fuller [Motor] owed the [defendant bank]." In that telephone conversation, Blanchette told David L. Christensen, defendant bank's president, and two other defendant bank employees, Steve Krause and Dave Doll, that some of the funds in Fuller Motor's account were moneys from the sale of Consumers' automobile, and demanded that defendant bank pay the check at issue, but the request was refused. Blanchette paid First National by obtaining a loan.

Christensen testified that defendant bank and Fuller Motor had a "floor plan financing arrangement" whereby defendant bank took a security interest in vehicles owned by Fuller Motor and noted liens on each of the vehicles. According to Christensen, as each vehicle was sold

> the dollars that were borrowed against those vehicles were supposed to be brought back into the bank and reduced or paid-down on that note. And at that time then the title would be released and given back to Fuller [Motor] so that he could present that title to the purchaser . . . .

Defendant bank released each lien individually. Contrarily, Norman K. Fuller, the president and owner of all the stock of Fuller Motor, testified that defendant bank did not begin requiring a lien release as each automobile was sold until the Blanchette incident. Mr. Fuller claimed nothing existed in writing between defendant bank and Fuller Motor requiring that when Fuller Motor sold an automobile, a certain amount of the money was to be applied against the debt with defendant bank. However, the various security agreements Fuller Motor

executed in connection with the floor-planned vehicles provide that sale of the vehicles specified as collateral in the security agreements constitutes an act of default.

The record further reveals that on April 8, 1985, Fuller Motor was indebted to defendant bank on two notes which incorporated various security agreements between the parties and were payable "on demand, or if no demand be made, then from time to time hereafter until maturity date." One note, authorizing a loan of up to $200,000, had a maturity date of June 4, 1985; the other note, authorizing a loan of up to $29,229.47, had a maturity date of August 21, 1985. The notes also provided that upon "demand for payment or upon the occurance [sic] of an Event of Default," the outstanding principal and accrued interest "shall, at the option of [defendant bank], become immediately due and payable . . . and [defendant bank] shall have the right to set-off any and all amounts due hereunder . . . against any indebtedness or obligation of" defendant bank to Fuller Motor. The notes defined six events of default, including the failure to pay amounts due, making false or misleading representations, a change in Fuller Motor's financial or other condition resulting in an impairment of defendant bank's security interest or in increasing defendant bank's risk, and a default under any related security agreement.

According to Christensen, defendant bank deemed itself insecure because seven of the Fuller vehicles, valued at $40,000, in which defendant bank had a security interest, were "out of trust"; that is, Fuller Motor sold the seven vehicles without turning the proceeds of the sale over to defendant bank to pay off the notes secured by those vehicles and thereby obtain a release of defendant bank's liens on them. Christensen also claimed defendant bank was insecure because Fuller Motor was using various techniques to improperly obtain cash from the bank. Accordingly, defendant bank made oral demand for payment of the notes on April 2, 1985, giving Fuller Motor 15 days to pay. However, defendant bank offset Fuller Motor's account on April 10, before the promised 15 days elapsed, because several vehicles remained out of trust; thus, according to Christensen, Fuller Motor had made false representations

and was, for this additional reason, in breach of its obligations under the note. Christensen testified that defendant bank's usual practice was to set off a debtor's account if it deemed itself insecure.

In the 30 days prior to Fuller Motor's issuance of the check to Blanchette, various defendant bank officials periodically, every 3 or 4 days, went to the Fuller Motor automobile lot to check on its inventory. Harold Ford, a salesman for Fuller Motor, testified that on these inspections he would point out to the defendant bank employees if a vehicle was on consignment to Fuller Motor, saying, "That's not on your list. That belongs to somebody else." According to Ford, defendant bank personnel would occasionally ask Ford if particular vehicles belonged to Fuller Motor. During this 30-day time period, Ford pointed out consignment vehicles "quite a few times." However, he could not "positively say" that he told them Consumers' automobile was a consigned vehicle, although Ford did say that defendant bank employees made inspections "two or three times, or more" during the 2 or 3 weeks that the automobile was on the lot. Christensen and other defendant bank employees denied that Ford ever pointed out consigned vehicles.

Christensen testified that because of its experience with Fuller Motor, its account was considered to be a "control account," meaning that it was examined by defendant bank's officers on an almost daily basis for the 20 days before defendant bank offset Fuller Motor's account. He further testified defendant bank was aware that Fuller Motor had consigned some vehicles to other dealers to sell, but was not aware that vehicles were consigned to Fuller Motor nor that Consumers specifically had an interest in the proceeds of the sale of its automobile by Fuller Motor. Other defendant bank employees also stated they knew nothing about the consignment of Blanchette's automobile to Fuller Motor nor of Consumers' interest in the proceeds until after defendant bank returned the check. Mr. Fuller did not remember having a conversation with defendant bank concerning the consignment of vehicles.

According to Christensen, nothing on the General Motors check or on the deposit slip Fuller Motor used to deposit the

check in its account indicated that Blanchette or Consumers had an interest in the funds represented by the General Motors check. Christensen further stated that nothing on Fuller Motor's signature card indicated that Fuller Motor was opening a special account. The card identified the account as one for business and designated no special instructions other than to make reference to the existence of a will. To Christensen's knowledge, defendant bank at no time asked anyone depositing money into Fuller Motor's account what the moneys were for.

Although Blanchette, in answering a compound question propounded by defendant bank, acquiesced in the conclusion that he did not tell defendant bank of Consumers' interest in the automobile until after Fuller Motor's account had been offset, the record, however, otherwise reflects that Blanchette did not know whether his telephone conversation with the bank, after his check was returned, took place before or after the offset was actually made. Blanchette agreed that until the telephone conversation, he did not tell defendant bank that Consumers had sold the automobile or had an interest in the check from General Motors to Fuller Motor, and that he did not post a sign on the vehicle saying it was on consignment. Mr. Fuller and Ford also testified that they did not place a consignment notice on Consumers' automobile.

Among Fuller Motor's records kept on file at defendant bank was an undated document, not generated by the bank, describing the Fuller Motor vehicles in which the bank had interests. Attached to it is a list of vehicles consigned to Fuller Motor and subsequently sold, on which the owners never received their money. Consumers' automobile appears on the list with a sale price of $11,600 and Potts as buyer. Christensen claimed that the document was created after the Fuller Motor check to Blanchette was returned, but Mr. Fuller said it was "very possible" that he gave the information in this document to the bank on April 2, 1985, although the automobile was not sold until April 5.

Mr. Fuller testified that possibly 10 percent of Fuller Motor's business involved the consignment of vehicles and that the general practice in the automobile dealership business in small communities was to sell customers' automobiles for them.

## II. ANALYSIS

It is appropriate that we begin our analysis of the issues presented by the assignments of error with a review of the law applicable to bank setoffs. In our most recent case on the subject, *Miracle Hills Ctr. Ltd. Part. v. Nebraska Nat. Bank*, 230 Neb. 899, 434 N.W.2d 304 (1989), the plaintiff sought an accounting, claiming the bank had wrongfully converted funds deposited to the account of the general contractor on plaintiff's construction project, and asked the court to impose an implied trust on the deposit for the benefit of the plaintiff and the subcontractors and materialmen on the project. The plaintiff claimed that "the bank had actual knowledge of the ownership of the funds and, at a bare minimum, sufficient knowledge to put the bank on inquiry as to the ownership of the funds." *Id.* at 902, 434 N.W.2d at 306. In reversing the summary judgment entered in favor of the plaintiff and directing that the bank's motion for summary judgment be sustained, we concluded, on a de novo review, as the matter was brought in equity, that the evidence established neither that the bank had actual knowledge of any special ownership in the funds nor notice of facts sufficient to put the bank on inquiry as to such special ownership. In so ruling, it was noted that we

"have long held that a bank may set off the funds of a depositor to pay a debt due the bank from the depositor . . . and, absent an agreement to the contrary or specific instructions from the debtor, a creditor may apply the proceeds to such debts and in such order as the creditor determines."

*Id.* We further stated:

A party claiming that a deposit made in the ordinary course of business was a special deposit bears the burden of proving the special nature of the deposit by clear and satisfactory evidence. Until such a showing has been made, deposits made in the ordinary course of business are general deposits.

(Citation omitted.) *Id.*

In *Globe Savings Bank v. National Bank of Commerce*, 64 Neb. 413, 89 N.W. 1030 (1902), the National Bank of Commerce brought an action against Globe Savings Bank,

alleging that Globe Savings improperly appropriated funds from the account of its depositor, Globe Loan & Trust Company, which funds were actually trust funds belonging to the National Bank of Commerce. The court determined that Globe Savings was "chargeable with knowledge that the check taken by the Globe Loan & Trust Company in payment of the warrants of [National Bank of Commerce] was a trust fund" because

> [t]he Globe Loan & Trust Company and the Globe Savings Bank transacted business in the same building and used the same vault, and both corporations were largely composed of the same stockholders and officers. The same person was president of both corporations, and the cashier of the Globe Savings Bank, who indorsed the check in question for deposit in the Commercial National Bank to the credit of his own bank, was secretary and treasurer of the Globe Loan & Trust Company, and other officers of the Globe Savings Bank were trustees and officers of the Globe Loan & Trust Company . . . .

*Id.* at 417, 89 N.W. at 1032.

We discussed the rules applicable thusly:

> There can be no question that a bank has a lien on the deposits of its customers for any debt due, and that it may apply a deposit made by a customer indebted to it in payment of an overdraft or any indebtedness which the bank may hold against him. This is the general rule; but, like all general rules, it has its exceptions. A bank can not apply money paid in by a customer and held by him as trustee for another to the payment of its own debt. If the bank has knowledge of the trust relation it will be liable for a conversion of the fund in case it applies it in satisfaction of its own indebtedness.

*Id.* at 416, 89 N.W. at 1032.

In *Allen Dudley & Co. v. First Nat. Bank*, 122 Neb. 443, 240 N.W. 522 (1932), we considered a situation in which a customer of the First National Bank, Herrick, purchased some cattle on a consignment basis for the plaintiff. Herrick paid for the cattle with a check, and then drew two sight drafts on the plaintiff's account and placed the proceeds therefrom in his own account.

The bank then set off a portion of those funds against Herrick's indebtedness to the bank. The sellers of the cattle presented Herrick's check for payment, but the bank refused to honor it. In holding that the setoff was improper, the court based its decision primarily on evidence that Herrick had bought and sold cattle the same way for 2 years through the bank. The court concluded:

> In the light of this testimony, it cannot be said that the appellant bank did not have knowledge of Herrick's manner of doing business, and when the two sight drafts were received on Sunday, November 17, 1929, it knew or should have known that these sight drafts were drawn on [plaintiff] against shipments of cattle which Herrick had made, and that Herrick had bought these cattle from various parties, as the record shows he had been in the habit of doing for a year or more, and that undoubtedly there were checks outstanding, representing the purchase price of these cattle, which were to be paid out of the proceeds of these drafts.

*Id.* at 448, 240 N.W. at 524. Accord, *State, ex rel. Sorensen, v. Bank of Otoe*, 125 Neb. 530, 251 N.W. 111 (1933); *State, ex rel. Sorensen, v. Farmers & Merchants Bank*, 125 Neb. 800, 252 N.W. 316 (1934).

Thus, a bank may not set off funds in a depositor's account in payment of the depositor's indebtedness to the bank when the bank knows or should know that the funds being set off belong to another. Having reviewed the law, we turn our attention to defendant bank's assignments of error.

### 1. Sufficiency of Evidence

In considering the first assignment of error, we remind ourselves that in determining the sufficiency of the evidence to sustain a verdict in a civil case, this court considers the evidence most favorably to the successful party and resolves evidential conflicts in favor of such party, which is entitled to every reasonable inference deducible from the evidence. A civil verdict will not be disturbed unless clearly wrong. Such a verdict is not to be set aside where the evidence is in conflict or where reasonable minds may reach different conclusions or inferences, as it is within the jury's province to decide issues of

fact. *Fisher Corp. v. Consolidated Freightways*, 230 Neb. 832, 434 N.W.2d 17 (1989). So considered, the evidence is sufficient to support the jury's implied conclusion that defendant bank either knew or should have known that the funds represented by the General Motors check belonged to someone other than Fuller Motor.

Notwithstanding the denial of defendant bank's president and other employees that they had not known of Fuller Motor's practice of selling automobiles consigned to it, there is evidence from which the jury could find that the bank should have known both that such was a common practice among automobile dealers and that Fuller Motor engaged in such practice. The jury could have believed Ford's testimony that on many occasions he pointed out to defendant bank employees, who were making routine checks of Fuller Motor's lot, that several automobiles on the lot had been consigned to Fuller Motor for sale. The jury could also have believed that Blanchette telephoned defendant bank and told the bank about his interest in the funds before the setoff was actually completed, particularly in view of defendant bank's use of the future tense when explaining to Blanchette why his check had been dishonored.

## 2. Motion in Limine

The second assignment of error claims the trial court should not have overruled defendant bank's motion in limine, which sought the exclusion of evidence concerning "the colloquy between Doug Teaford of The First National Bank in Ogallala and the agent of [defendant bank]" relating to Teaford's inquiries as to whether there were sufficient funds in Fuller Motor's account to cover its check, because of the "prejudicial effect" of such testimony.

While the district court overruled the motion in limine, Teaford's testimony as to the conversation he had with an unknown employee of defendant bank was excluded at trial as irrelevant. Nevertheless, defendant bank claims there was error because Blanchette made reference to the conversation in his testimony as follows:

> Q. . . . . While you were at the bank did anybody make a phone call concerning this check that you know of?

. . . .

    A. I believe Doug Teaford called the Keith County Bank.

    Q. And that was in your presence?

    A. Apparently it was in my presence; however, I was not a part of it at the moment.

Defendant bank objected to this testimony on the ground it was not relevant, but did not preserve the ground of its motion in limine that the evidence was prejudicial. This court therefore reviews the evidence only on the basis of relevance. *State v. Cox, ante* p. 495, 437 N.W.2d 134 (1989). See, also, *Maricle v. Spiegel*, 213 Neb. 223, 329 N.W.2d 80 (1983) (generally, a proper objection to the receipt of evidence is required to preserve for review any error in overruling of motion in limine).

    The appropriate standard of review for an assignment of error directed at the exclusion or admission of evidence is one of abuse of discretion. *Turner v. Welliver*, 226 Neb. 275, 411 N.W.2d 298 (1987).

    Evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence, *In re Interest of Adams*, 230 Neb. 109, 430 N.W.2d 295 (1988), and Neb. Rev. Stat. § 27-401 (Reissue 1985), or the evidence tends to establish a fact from which the existence or nonexistence of a fact in issue can be directly inferred, *Nixon v. Harkins*, 220 Neb. 286, 369 N.W.2d 625 (1985).

    Blanchette's testimony that Teaford called defendant bank is relevant to the question of whether defendant bank converted his funds, in that the testimony related to the state of defendant bank's knowledge of Blanchette's interest in the proceeds of the General Motors check at the time of the setoff. Accordingly, it cannot be said the district court abused its discretion in receiving the disputed testimony.

### 3. Requested Instruction

    Finally, the third assignment of error complains that the district court refused defendant bank's request to inform the jury of the entire contents of Neb. U.C.C. §§ 2-326 *and 9-114* (Reissue 1980). Even if it could be said that advising the jury of

all that these multifaceted statutes contain without relating any portion of that language to the evidence would have properly instructed the jury, a matter we do not decide, there are other reasons which make the district court's ruling correct.

### a. *Section 2-326*

Section 2-326 concerns itself with when a transaction involving consigned goods is a "sale on approval" or a "sale or return." So far as is relevant to our inquiry, the statute provides that unless a consignor makes known his interest in goods he or she delivers for sale to a consignee who maintains a place of business at which the consignee deals in goods of the kind involved, then with respect to claims of such consignee's creditors, the goods are deemed to be a sale or return.

The situation is, however, that no dispute exists as to whether the delivery of the automobile to Fuller Motor was to be considered a sale on approval or a sale or return. The statute has nothing to do with determining whether defendant bank knew or had notice of facts sufficient to put it on notice that Blanchette had an interest in the General Motors check and thus converted Blanchette's funds. As a consequence, the instruction is not applicable to the evidence in this case and could play no proper role in the jury's deliberations. See, *Zeeb v. Delicious Foods, ante* p. 358, 436 N.W.2d 190 (1989); *Fisher Corp. v. Consolidated Freightways*, 230 Neb. 832, 434 N.W.2d 17 (1989).

### b. *Section 9-114*

Section 9-114 concerns itself with the priority of rights between a consignee's creditors and those of a consignor. Defendant bank argues that because it had a perfected security interest in all the present and after-acquired inventory of Fuller Motor, it acquired a priority interest superior to that of Blanchette in the subject automobile and thus was entitled to the funds generated by the General Motors check.

However, a defense which rests on the priority status of a security interest is an affirmative one which must be pled as well as proved. See *Omaha Loan & Bldg. Assn. v. Turk*, 146 Neb. 859, 21 N.W.2d 865 (1946). Defendant bank fails to allege facts which can be said to support an inference that if the automobile were the property of Fuller Motor, defendant bank would have

a perfected security interest in the automobile which was superior to any interest Blanchette might have had in it. It is the duty of a trial court to instruct the jury only on issues which are pled and find support in the evidence. *Maloney v. Kaminski,* 220 Neb. 55, 368 N.W.2d 447 (1985). Since the claimed superiority of defendant bank's interest was not placed in issue by its answer, the district court properly refused to instruct the jury with regard to the provisions of § 9-114.

### III. DECISION

Inasmuch as the record fails to sustain any of defendant bank's assignments of error, the judgment of the district court is affirmed.

AFFIRMED.