WILLIAM O. WILLIAMS, PERSONAL REPRESENTATIVE OF THE ESTATE OF KARI L. WILLIAMS, DECEASED, APPELLEE, V. MONARCH TRANSPORTATION, INC., APPELLANT.

470 N.W.2d 751

Filed June 14, 1991.   No. 88-1074.

William J. Dunn and John W. Iliff, of Gross & Welch, P.C., for appellant.

J. Michael Coffey, of Stave & Coffey, P.C., and, on brief, Donald W. Kleine, of Kleine Law Office, for appellee.

HASTINGS, C.J., WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

SHANAHAN, J.

In the district court for Sarpy County, William O. Williams, personal representative of the estate of Kari L. Williams, brought a wrongful death action against Monarch Transportation, Inc., regarding a collision between an automobile driven by Kari L. Williams and a truck owned and operated by Monarch. The collision resulted in Kari's hospitalization and eventual death on October 14, 1987. After Monarch admitted liability for the collision and Kari's death, only the question of damages was submitted to the jury, which awarded $15,804.46 for Kari's hospital and funeral expenses and $250,000 for pecuniary loss sustained by Kari's next of kin.

Monarch appeals and contends that the $250,000 verdict is contrary to law, unsustainable under the evidence, and the product of passion, prejudice, speculation, and sympathy.

Kari, who died at age 24, was survived by her parents, Shirley Ann and William "Bill" Williams, who were near 50 years of age at the time of Kari's death. Shirley Ann and Bill Williams have been married for 31 years, throughout which they have lived in Springfield, Nebraska. Both Shirley Ann and Bill Williams are employed. Kari had an older sister, two younger sisters, and an older brother.

Until a year before her death, Kari had lived with her parents in their home, where the Williams children had grown up. As

the middle child in the family, Kari was the "mediator," one who would always "smooth things over" when childhood quarrels developed.

According to one of Kari's junior high school teachers, Kari was "[v]ery positive. She was a very bright, very upbeat, cheerful type of young lady, kind of a spark plug with a group, I guess. Always kind of kept the group happy and cheerful and doing positive and constructive things."

When Kari attended Platteview High School near Springfield, she also participated in volleyball, basketball, and track. Describing Kari's involvement in those extracurricular activities, Robert Icenogle, a Platteview teacher, characterized Kari: "She gave her best. She would make any sacrifice that was needed or called for . . . ." Also, Icenogle noted that Kari was family oriented and frequently talked about her family's activities. Icenogle observed that there was a "[v]ery close relationship" between Kari and her parents, with whom she was "always very close, very supportive."

The day after she was graduated from high school, Kari began employment in the office of Timmerman Feedyards near Springfield, where she earned $19,000 annually. Gerald Timmerman, owner of the feedyard, described Kari as an "extraordinary" employee who displayed "[u]nlimited" potential and a combination of "a business manner and a very personal manner . . . a talent, you know, that God gives somebody, you don't develop that." According to Timmerman, "the only thing that ever meant more to [Kari] than her work and her friends was her family." In Timmerman's view, the Williams family was the "upmost first" priority in Kari's life.

About a year before her death, Kari arranged to rent a house from her brother, Mike. That house was located 1 mile from the home of Shirley Ann and Bill Williams. According to Mike, Kari felt it was time to leave the family home, but she wanted to live near her parents "so she could always stop in." After Kari moved, she visited her parents almost daily, sometimes stopping by and saying "just checking on you," but many times staying for dinner and late into the evening, or even overnight. In the words of Bill Williams, Kari was "[a]lways . . . in contact with you no matter what." As Mike Williams recounted, "There

[were] a lot of times it still looked like [Kari] lived there." According to Kari's mother and father, they "saw her just as much after she was gone as [they] did while she lived there."

As far as family events were concerned, Kari was the "great organizer." She cooked, set up tables, decorated, and cleaned her parents' home for large holiday gatherings. When a family birthday was approaching, Kari always contacted each family member to remind them, or to tell them about a family celebration which had been planned. Kari "went a lot of places" with Shirley Ann and Bill Williams, including a vacation trip to Minnesota in the summer preceding Kari's death. On weekends, according to Bill Williams: "It was a Sunday ritual . . . we [Kari and her parents] went to church every Sunday morning. After church, we go out and have breakfast together and that was just the way it was on Sunday mornings." Kari and her mother shopped together almost every weekend and often had lunch together during the week. As Shirley Ann Williams expressed: "Kari lived at home as an adult probably more than the other girls . . . . I got to know her more on the basis of a friend. She became a friend as well as a daughter. She was probably my best friend." Although Kari moved from the family home, she continued to help her parents with various tasks, such as gardening and preparation of family gatherings. Kari's relationship with her parents never changed before her death. As Shirley Ann Williams expressed Kari's relationship with her parents: "If you ever needed help with anything at all, all you had to do was call Kari."

Monarch did not cross-examine any witness who testified about Kari's relationship with Shirley Ann and Bill Williams and her activities involving her parents. Monarch did not present any case in chief.

The court correctly instructed the jury on the elements of damages recoverable in a Nebraska wrongful death action. The jury returned its verdict for $265,804.46, including $250,000 for pecuniary loss sustained by Kari's next of kin.

## STANDARD OF REVIEW

A verdict in a civil case will be upheld on appeal unless a jury's finding, necessary for the verdict, is clearly erroneous.

See, *Chadron Energy Corp. v. First Nat. Bank*, 236 Neb. 173, 459 N.W.2d 718 (1990); *Blanchette v. Keith Cty. Bank & Trust Co.*, 231 Neb. 628, 437 N.W.2d 488 (1989).

"A verdict in a civil case must be sustained if the evidence, viewed and construed most favorably to the prevailing party, is sufficient to support that verdict." *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 443, 412 N.W.2d 56, 70 (1987). As expressed in *Rahmig*: "A verdict will not be set aside on appeal unless it is so clearly exorbitant as to indicate that it was the result of passion, prejudice, or mistake, or it is clear that the trier of fact disregarded the evidence or rules of law." 226 Neb. at 457, 412 N.W.2d at 78.

[A] verdict may be set aside as excessive or inadequate when, and not unless, it is so excessive or inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record. If a verdict shocks the conscience, it necessarily follows that the verdict was the result of passion, prejudice, mistake, or some other means not apparent in the record.

*Crewdson v. Burlington Northern RR. Co.*, 234 Neb. 631, 643, 452 N.W.2d 270, 280 (1990). Accord, *Maloney v. Kaminski*, 220 Neb. 55, 368 N.W.2d 447 (1985); *Brahatcek v. Millard School District*, 202 Neb. 86, 273 N.W.2d 680 (1979); *Caradori v. Fitch*, 200 Neb. 186, 263 N.W.2d 649 (1978). See, also, Neb. Rev. Stat. § 25-1142 (Reissue 1989) (vacation of verdict for award of excessive damages given under the influence of passion or prejudice).

## WRONGFUL DEATH DAMAGES

Concerning the amount of recovery in a wrongful death action, Neb. Rev. Stat. § 30-810 (Reissue 1989) in pertinent part provides: "The verdict or judgment should be for the amount of damages which the persons [widow, widower, or next of kin] in whose behalf the action is brought have sustained."

In *Maloney v. Kaminski*, 220 Neb. 55, 69, 368 N.W.2d 447, 458 (1985), this court stated: "We have held that a wrongful death plaintiff may only recover for a pecuniary loss, meaning a loss which has a money value."

In relation to "pecuniary loss" and "money value," this court has consistently recognized that in an action for wrongful death of a child, recoverable damages include parental loss of the child's society, comfort, and companionship. See, *Crewdson, supra*; *Nelson v. Dolan*, 230 Neb. 848, 434 N.W.2d 25 (1989); *Garvin v. Coover*, 202 Neb. 582, 276 N.W.2d 225 (1979); *Selders v. Armentrout*, 190 Neb. 275, 207 N.W.2d 686 (1973). See, also, *Ballweg v. City of Springfield*, 114 Ill. 2d 107, 120, 499 N.E.2d 1373, 1379 (1986): "When children are wrongfully killed, the parents' investment of money and in affection, guidance, security and love is destroyed. Society recognizes the destruction of that value, whether the child is a minor or an adult."

"The term 'society' embraces a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection." *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 585, 94 S. Ct. 806, 39 L. Ed. 2d 9 (1974) (wrongful death action). Accord, *Singh v. Air Illinois, Inc.*, 165 Ill. App. 3d 923, 520 N.E.2d 852 (1988); 1 S. Speiser, Recovery for Wrongful Death § 3:49 (2d ed. 1975). "[T]here is a growing appreciation of the true value to the parent of the rewards which flow from the family relationship and are manifested in acts of material aid, comfort, and assistance . . . ." *Fussner v. Andert*, 261 Minn. 347, 353, 113 N.W.2d 355, 359 (1961).

> Quite obviously it is impossible to generalize on the extent to which persons . . . enjoy each other's companionship and society. This is a highly personal relationship which must of necessity be decided on a case-by-case basis. When it relates to a parent and child, it depends on all the circumstances important in the lives of a *particular* parent and a *particular* child.

(Emphasis in original.) *Pagitt v. City of Keokuk*, 206 N.W.2d 700, 703 (Iowa 1973).

In *Wycko v. Gnodtke*, 361 Mich. 331, 338-40, 105 N.W.2d 118, 122-23 (1960), the Supreme Court of Michigan observed:

> What, then, is the pecuniary loss suffered because of the taking of the child's life? It is the pecuniary value of the

life. . . .

. . . [A]n individual member of a family has a value to others as part of a functioning social and economic unit. This value is the value of mutual society and protection, in a word, companionship. The human companionship thus afforded has a definite, substantial, and ascertainable pecuniary value and its loss forms a part of the "value" of the life we seek to ascertain.

Cf., *Smith v City of Detroit*, 388 Mich. 637, 202 N.W.2d 300 (1972); *Breckon v. Franklin Fuel Co.*, 383 Mich. 251, 174 N.W.2d 836 (1970).

Regarding the pecuniary loss requirement for wrongful death damages, this court noted that

the word "pecuniary" is not to be construed in a strict sense, that it is difficult to determine its exact measure, and that the task of determining such must be left to the good judgment and ordinary common sense of the jurors. The law does not provide any positive, definite mathematical formula or legal rule by which a jury shall fix the amount of pecuniary loss; it must be determined upon a consideration of the circumstances of each case. [Citations omitted.] There is no requirement that there be evidence of the dollar value of companionship, counseling, or advice. It is a matter left to the sound discretion of the jury.

*Maloney v. Kaminski*, 220 Neb. 55, 69-70, 368 N.W.2d 447, 458 (1985). See, also, *Garvin, supra* (wrongful death damages are incapable of computation and are largely a matter for the jury); *Selders v. Armentrout*, 192 Neb. 291, 293, 220 N.W.2d 222, 224 (1974) (damages in wrongful death cases are peculiarly for the jury to determine because of the numerous contingencies involved, and "[a]t best, the verdict can only be an approximation as no yardstick exists by which the correct answer can be found with exactness"). Thus, in an action for wrongful death of a child, "money value" of parental loss is not limited to, always equated with, or necessarily dependent on deprivation of the child's monetary contribution toward parental well-being.

According to one commentator, a wrongful death action is

"sui generis" and involves placing a monetary value on a human life; hence, determination of wrongful death damages, which may elude a precise mathematical calculation, is left to a jury, which "possesses discretion, and [which] is given wide latitude to exercise its sound judgment and good sense, aided by proper instructions from the court." 2 S. Speiser, Recovery for Wrongful Death § 9:2 at 4 (2d ed. 1975).

In a wrongful death action, damages are not recoverable for mental suffering or anguish, bereavement, or solace. *Crewdson v. Burlington Northern RR. Co.*, 234 Neb. 631, 452 N.W.2d 270 (1990); *Nelson v. Dolan*, 230 Neb. 848, 434 N.W.2d 25 (1989); *Garvin v. Coover*, 202 Neb. 582, 276 N.W.2d 225 (1979). Speiser reminds us of the difference between compensation for mental anguish, bereavement, or solace and compensation for loss of society, comfort, and companionship:

When we speak of recovery for the beneficiaries' mental anguish, we are primarily concerned, not with the benefits they have lost, but with the issue of compensating them for their harrowing experience resulting from the death of a loved one. . . . The fundamental question in this area of damages is what deleterious effect has the death, as such, had upon the claimants? In other areas of damage, we focus on more positive aspects of the injury such as what would the decedent, had he lived, have *contributed* in terms of support, assistance, training, comfort, consortium, etc.

(Emphasis in original.) 1 S. Speiser, Recovery for Wrongful Death § 3:52 at 327 (2d ed. 1975).

## THE VERDICT

Throughout its brief, Monarch emphasizes that nothing established Kari's past monetary contribution to Shirley Ann and Bill Williams or indicated Kari's prospective monetary contributions to her parents. Therefore, Monarch argues, the $250,000 verdict is excessive in this wrongful death action.

However, there is no exact fiscal formula for determination of damages recoverable for loss of society, comfort, and companionship, a loss which is not subject to some strict accounting method based on monetary contributions, past or

prospective. Rather, "the society, care and attention of a deceased [family member] are 'services' having financial value which may be both measured and compensated." 1 S. Speiser, *supra*, § 3:49 at 321.

There is nothing to contradict or undermine the evidence of Kari's relationship with her parents, Shirley Ann and Bill Williams, or Kari's activities which were a source of society, comfort, and companionship for her parents. Given the history of an extraordinary young woman's very remarkable relationship with her parents, the jury in this case obviously evaluated the future by the past and, accordingly, returned its verdict to compensate for the loss caused by Kari's death. We conclude that the Williams verdict is supported by relevant evidence and cannot conclude that the verdict resulted from passion, prejudice, or mistake. Thus, we are unable to state that the Williams verdict is excessive under the circumstances.

AFFIRMED.

COLWELL, D.J., Retired, dissenting.

I disagree with the majority on the issue of the amount of damages allowed by the jury for pecuniary loss; from the record the verdict for $250,000 was clearly wrong, being excessive, as it shocks the conscience. See *Crewdson v. Burlington Northern RR. Co.*, 234 Neb. 631, 643, 452 N.W.2d 270, 280 (1990):

> [A] verdict may be set aside as excessive or inadequate when, and not unless, it is so excessive or inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record. If a verdict shocks the conscience, it necessarily follows that the verdict was the result of passion, prejudice, mistake, or some other means not apparent in the record.

Concerning the $250,000 verdict, the court's instruction No. 8 told the jury to reduce any damages allowed for loss of society, comfort, and companionship to their present cash value. There is nothing in the record showing how the jury followed that instruction.

The issue presented here is whether or not the $250,000 jury verdict was excessive as it relates to the pecuniary loss of Kari's society, comfort, and companionship, or, simply, how much

was that loss worth in money to the next of kin (parents). Such elements of loss are recoverable under Neb. Rev. Stat. § 30-810 (Reissue 1989), which provides in part, "The verdict or judgment should be for the amount of damages which the persons in whose behalf the action is brought have sustained." That statute does not require pecuniary loss; however, that element has been included by judicial interpretation. The statutory and judicial interpretation history of § 30-810 has been reviewed in such cases as *Ensor v. Compton*, 110 Neb. 522, 194 N.W. 458 (1923), *Selders v. Armentrout*, 190 Neb. 275, 207 N.W.2d 686 (1973), *Nelson v. Dolan*, 230 Neb. 848, 434 N.W.2d 25 (1989), and other cases, including the provision in Gen. Stat. ch. 15, § 2 (1873), that recovery shall be limited to $5,000.

There are some definite limitations to the recovery for pecuniary loss in wrongful death cases.

> Nothing can be allowed on account of mental suffering or bereavement or as a solace on account of such death. . . . [R]ecovery for loss of services and companionship by a surviving husband or wife can only be sustained where the evidence shows a reasonable probability that such services and companionship afforded the survivor was [sic] of such a character that it would be of advantage to such survivor, and that a disallowance thereof would cause a pecuniary loss to him or her.

*Ensor v. Compton, supra* at 524, 194 N.W. at 459. "This change . . . does not provide a wide open door to all sorts of claims for damages." *Id.* "[A] wrongful death plaintiff may only recover for a pecuniary loss, meaning a loss which has a money value." *Maloney v. Kaminski*, 220 Neb. 55, 69, 368 N.W.2d 447, 458 (1985); *Garvin v. Coover*, 202 Neb. 582, 276 N.W.2d 225 (1979). Neb. Rev. Stat. § 25-1142(4) (Reissue 1989) provides that a new trial shall be granted if there are "excessive damages, appearing to have been given under the influence of passion or prejudice." (See the "shock the conscience" rule above-quoted in *Crewdson*.)

With the rule allowing recovery in wrongful death cases for pecuniary loss of society, comfort, and companionship for both minors (*Selders*) and adults (*Garvin*), the court has struggled in

a search for some basis or guideline to consider and evaluate verdicts and judgments on the issue of whether they are excessive or inadequate. The court has said:

> It is virtually impossible to "color match" cases in attempting to decide a given issue. . . .
>
> . . . [O]ne common thread runs throughout all of those cases, namely, that damages in any wrongful death case are incapable of computation and are largely a matter for the jury. . . . ". . . 'The amount to which a parent is entitled cannot be accurately determined because of the numerous contingencies involved. The amount being very problematical, it is peculiarly for the jury to determine, after hearing all the evidence bearing upon the situation, including the parent's position in life, the physical and mental condition of the child, his surroundings and prospects, and any other matter that sheds light upon the subject. Members of juries generally have children of their own and have information as to the pecuniary value of children's services and the expense involved in their care and education. A jury is peculiarly fitted to determine the loss sustained by a parent in such a case. At best, the verdict can only be an approximation as no yardstick exists by which the correct answer can be found with exactness.' . . ."

*Garvin v. Coover, supra* at 586-87, 276 N.W.2d at 227. Later, in *Maloney, supra* at 69, 368 N.W.2d at 458, the court stated that

> the word "pecuniary" is not to be construed in a strict sense, that it is difficult to determine its exact measure, and that the task of determining such must be left to the good judgment and ordinary common sense of the jurors. The law does not provide any positive, definite mathematical formula or legal rule by which a jury shall fix the amount of pecuniary loss; it must be determined upon a consideration of the circumstances of each case.

From the foregoing, the conclusion is inescapable that in wrongful death cases such as the case at bar there are few clear rules or guidelines for the fact finder in arriving at a verdict/judgment which can be examined along with the record when challenged as either excessive or inadequate.

Likewise in such cases, there are few clear guidelines or rules for the appellate court to follow in order to carry out its duty to provide justice to all parties, including (1), unless the jury is clearly wrong, the reviewing court will not interfere with the jury verdict, *Garvin v. Coover, supra*; (2) a new trial shall be granted "for excessive or inadequate damages as to be the result of passion or prejudice," see *Crewdson* and § 25-1142 (this seldom factually appears in the record); (3) damages for mental suffering, bereavement, or solace are not recoverable (here again, there is seldom clear evidence in the record supporting these items); and (4) a verdict or judgment shall not be sustained if it shocks the conscience (again, there is no uniformity or color-matching process to equate the record with conscience).

From a review of the cases, it is apparent no attempt has been made in Nebraska to achieve uniform assessment of pecuniary loss in wrongful death cases. In *Garvin, supra*, the court reviewed awards made in several prior cases and then affirmed a damages award of "none," finding it was not inadequate. In *Garvin* the facts surrounding the life and death of the 20-year-old single decedent were similar to those in the case at bar. Later, in *Crewdson v. Burlington Northern RR. Co.*, 234 Neb. 631, 452 N.W.2d 270 (1990), the court reversed and set aside a $510,000 verdict (as reduced to its present cash worth) as being excessive and shocking the conscience; the facts surrounding the life and death of the 21-year-old single male decedent were similar to those in the case at bar. From the foregoing, the most that can be deduced as to the issue of pecuniary loss is that "none" is acceptable and $510,000 is too much.

The dilemma presented to the court in these wrongful death cases, absent a clear showing in the record that the damages award is excessive or inadequate as the result of passion, prejudice, mistake, or other means, is either for the court to approve the jury verdict on the theory that the assessment of pecuniary loss is for the jury to determine or, after examining the record, for the court to decide whether the verdict is excessive, as it shocks the conscience, for which decision there are no guidelines.

It is undisputed in the case at bar that the decedent, Kari L.

Williams, age 24 years, prior to her death was a bright, considerate, dependable, and loving adult child who was devoted to her parents, William and Shirley Williams, and to her siblings; that her family regularly enjoyed Kari's companionship; and that her family was rightfully proud of Kari's industry and accomplishments. Kari had lived outside of the family home for about 1 year, and she intended to be married in the near future, when she would establish her own marital home and future. Her family had hoped and expected that their family relationships would continue.

From this record, the majority apparently relied upon the sound discretion of the jury to compensate for the loss caused by Kari's death by evaluating the future with the past, and the award of $250,000 was not found to be excessive, on the conclusion that the verdict was not a result of passion, prejudice, or mistake.

The majority's conclusion on this issue is a further erosion of the element of pecuniary loss in wrongful death cases and the rule, "A wrongful death plaintiff may only recover for a pecuniary loss, meaning a loss which has a money value." See *Maloney v. Kaminski*, 220 Neb. 55, 368 N.W.2d 447 (1985). It brings into focus the dissent of Chief Justice White in *Selders v. Armentrout*, 190 Neb. 275, 207 N.W.2d 686 (1973), challenging the rule in that case extending the recovery in the wrongful death of a child to include loss of society, comfort, and companionship of the child. Chief Justice White argued that the rule permitted recovery for emotional reasons:

> In the hands of an imaginative lawyer, marshaling family albums and the testimony of sympathetic friends, and demonstratively organized and staged by a histrionic-minded lawyer, this court will undoubtedly be faced in the future with the almost impossible job of attempting to apply the generalized principles of excessiveness of a verdict to these judgments, which by their nature are an attempt to award money for a purely emotional loss conjectural, speculative in nature, and incapable of measurement or proof by any objective standard or related criteria.

*Id.* at 282, 207 N.W.2d at 690.

From my review of the record, the jury verdict of $250,000 for pecuniary loss was clearly wrong, being excessive, as it shocks the conscience, and, accordingly, it was the result of either passion, prejudice, mistake, or some other means not apparent from the record. The verdict should be reversed and the cause remanded for a new trial on plaintiff's second cause of action on the issue of damages for pecuniary loss suffered by decedent's next of kin. See *Crewdson v. Burlington Northern RR. Co., supra.*

Lastly, I object to these majority citations as being contrary to existing Nebraska law: (1) "When children are wrongfully killed, the parents' investment of money and in affection, guidance, security and love is destroyed. Society recognizes the destruction of that value, whether the child is a minor or an adult." *Ballweg v. City of Springfield,* 114 Ill. 2d 107, 120, 499 N.E.2d 1373, 1379 (1986). That language in the Illinois case was in support of the rule that under its wrongful death act, "there is a presumption of loss of society for an adult child." *Id.* Nebraska has no such presumption; rather, pecuniary loss is a fact question for the jury. (2) Although Nebraska recognizes the loss of society, comfort, and companionship of a deceased adult child as an element of damage, see *Garvin v. Coover,* 202 Neb. 582, 276 N.W.2d 225 (1979), the majority attempts to extend and define this element by quoting from 1 S. Speiser, Recovery for Wrongful Death § 3:49 at 321 (2d ed. 1975): "[T]he society, care and attention of a deceased [family member] are '*services*' having financial value which may be both measured and compensated." (Emphasis supplied.) That rule is not in accord with Nebraska law.