JoAnn Brandon, Personal Representative of the Estate of Teena Brandon, deceased, appellant and cross-appellee, v. The County of Richardson, Nebraska, and Charles B. Laux, Richardson County Sheriff, appellees and cross-appellants.

624 N.W.2d 604

Filed April 20, 2001. No. S-00-022.

David S. Buckel, and, of Counsel, Doni Gewirtzman and Marvin Peguese, of Lambda Legal Defense and Education Fund, Inc., Michael J. Hansen, P.C., Herbert J. Friedman, of Friedman Law Offices, and John Stevens Berry, of Berry, Kelley & Reiman, for appellant.

Richard L. Boucher and Kim K. Sturzenegger, of Boucher Law Firm, for appellees.

Kristin E. Yates, and, of Counsel, Shannon Minter and Jennifer Levi for amicus curiae Harry Benjamin International Gender Dysphoria Association.

Jeffry D. Patterson, of Healey & Wieland Law Firm, for amicus curiae Nebraska Association of Trial Attorneys.

Amy A. Miller, of American Civil Liberties Union of Nebraska, and, of Counsel, Michael Adams and Jennifer Middleton, of American Civil Liberties Union, New York, and of Counsel, Melvyn L. Cantor, Reuven L. Cohen, and Matthew D.

Strada, of Simpson, Thacher & Bartlett, for amici curiae American Civil Liberties Union Foundation et al.

John G. Taylor, of Taylor Law Office, and M. Elaine Johnston, Patrick Barnett, and Marc L. Moore, of White & Case, L.L.P., for amici curiae Parents of Murdered Children, Inc., and National Center for Victims of Crime.

Pamela Coukos, of Mehri, Malkin & Ross, P.L.L.C., and Susan Ann Koenig and Angela J. Dunne, of Law Office of Susan Ann Koenig, P.C., for amici curiae Nebraska Domestic Violence Sexual Assault Coalition et al.

Charles B. Crisman, Jr., and, of Counsel, W. Mason Emnett and Richard L. Parker for amici curiae Gender Public Advocacy Coalition et al.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## INTRODUCTION

On December 31, 1993, Teena Brandon (Brandon), Lisa Lambert, and Phillip Devine were found murdered in Lambert's rural Humboldt farmhouse in Richardson County, Nebraska. John L. Lotter and Thomas M. Nissen, also known as Marvin T. Nissen, were convicted of the murders. See *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), and *State v. Nissen*, 252 Neb. 51, 560 N.W.2d 157 (1997). Brandon's mother, JoAnn Brandon (JoAnn), brought an action against Richardson County and Sheriff Charles B. Laux for negligence, wrongful death, and intentional infliction of emotional distress in connection with Brandon's murder and the events leading up to her death.

The district court found the county negligent and awarded economic damages of $6,223.20 and noneconomic damages of $80,000. However, the court reduced the damage award on the negligence claim by 85 percent for the intentional torts of Lotter and Nissen, and by 1 percent for the negligence of Brandon. The court denied recovery on the intentional infliction of emotional distress claim and awarded "nominal damages" for loss of soci-

ety, comfort, and companionship. JoAnn appeals, and the county cross-appeals.

## FACTUAL BACKGROUND

Brandon had been sexually abused as a child, and in her late teens, developed gender identity disorder, a condition in which one develops a strong dislike for one's own gender and assumes the characteristics, both behaviorally and emotionally, of the other gender. In November 1993, Brandon came to Richardson County after leaving Lincoln due to legal troubles. Brandon had been convicted of forgery in Lancaster County and had violated the terms of her probation. While in Richardson County, Brandon presented herself as a man. Brandon had obtained a driver's license identifying Brandon as a male by the name of Charles Brayman.

In December 1993, Brandon met Lana Tisdel, a young woman who resided in Falls City. Tisdel, believing Brandon to be a male, dated Brandon for approximately 1 month. After moving to Richardson County, Brandon also became acquainted with Lotter and Nissen. On December 15, Brandon was booked into the Richardson County jail on forgery charges for forging checks in Richardson County. Brandon was placed in an area of the jail where females are usually held. While Brandon was being held at the jail, Laux referred to Brandon as an "it" during a conversation with Tisdel which took place in Brandon's presence. A few days later, Nissen secured Brandon's release from jail by posting bail with money Tisdel gave to Nissen. Thereafter, Lotter and Nissen became suspicious of Brandon's sexual identity.

On December 24, 1993, several people, including Brandon and Tisdel, attended a party at Nissen's home. In the early morning hours of December 25, in an attempt to prove to Tisdel that Brandon was a female, Lotter and Nissen pulled Brandon's pants down in Tisdel's presence.

Later that same morning, Lotter and Nissen beat Brandon, hitting her in the head, kicking her in the ribs, and stepping on her back. Lotter and Nissen then drove Brandon to a remote location where both Lotter and Nissen sexually assaulted Brandon. After the sexual assaults, Nissen beat Brandon again.

When they returned to Nissen's house, Brandon escaped by kicking out a bathroom window and ran to the home of Linda Gutierres, Tisdel's mother.

When Brandon arrived at Gutierres' home at approximately 6 a.m., Brandon had a swollen, bloody lip, scratches, and a "shoe print" on her back, and she was crying. An ambulance was called, and Brandon was transported to the local hospital, where Brandon reported that she had been beaten and sexually assaulted. A rape examination was performed at the hospital, and the results, which showed that Brandon had been sexually penetrated, were turned over to law enforcement.

Around noon that same day, Brandon provided a written statement to the Falls City Police Department regarding the rapes. Later that day, Laux and Deputy Tom Olberding of the Richardson County sheriff's office conducted a tape-recorded interview with Brandon. Prior to the interview, Laux had been informed by the hospital staff that Brandon had been beaten and sexually penetrated. Olberding conducted the initial interview, during which Brandon described the rapes, including the location where the rapes occurred, and that Lotter and Nissen had used condoms during the rapes. Brandon also indicated that she had a pair of rolled-up socks in her pants at the time of the rapes. Laux was present in the interview room the entire time Olberding was questioning Brandon.

After Brandon had initially related the details of the rapes to Olberding and Laux, Laux began questioning Brandon regarding the details of the rapes a second time, beginning at approximately 3:40 p.m. on December 25, 1993. Shortly after Laux began questioning Brandon, Olberding left the room. At that time, Olberding had a brief conversation with Keith Hayes, an investigator with the Falls City Police Department, who was present outside the interview room. Olberding indicated that he left the room because he "didn't like the way [the interview] was going." Olberding returned to the interview room a short time later. (All quotations from the December 25 interview appearing in this opinion are taken from the tape-recorded version of the interview.)

While questioning Brandon about the incident that occurred at Nissen's house during which Lotter and Nissen pulled down Brandon's pants, the following exchange took place:

Q. [A]fter he pulled your pants down and seen you was a girl, what did he do? Did he fondle you any?

A. No.

Q. He didn't fondle you any, huh. Didn't that kind of amaze you? . . . Doesn't that kind of, ah, get your attention somehow that he would've put his hands in your pants and play with you a little bit?

. . . .

Q. [Y]ou were all half-ass drunk . . . . I can't believe that if he pulled your pants down and you are a female that he didn't stick his hand in you or his finger in you.

A. Well, he didn't.

Q. I can't believe he didn't.

While interviewing Brandon regarding the rapes, Laux's statements and questions included the following: "So they got ready to poke you"; "[t]hey tried sinking it in your vagina"; "So then after he couldn't stick it in your vagina he stuck it in your box or in your buttocks, is that right?"; "[D]id it feel like he stuck it in very far or not?"; "Did he tell you anything about this is how they do it in the penitentiary?"; "Was he enjoying it?"; "Did he think it was funny?"; "Did he play with your breasts or anything?"; and "Well, was he fingering you?"

Laux confronted Brandon regarding the position of her legs during the sexual assault by Nissen in the following manner:

Q. How did you have your legs when he was trying to do that?

A. He had them positioned on each side and he was positioned in between my legs.

Q. You had your legs, ah, your feet up around his back or did you just have them off to the sides or what?

A. I had one foot on the floor and the other on the seat.

. . . .

Q. He had you on the back seat and you had one leg on the seat the one leg up up over the front seat or where?

A. One leg on the floor and the other just laying [sic] on the seat not on top of the guy.

Q. You had one leg on the back seat and one leg laying [sic] on the floor. Now just earlier when I asked you, you

said you had one leg up around him and one leg over the seat.

A. No, I didn't.

Q. Yeah, because I can play it back for you.

A. Then play it back because I don't understand it.

After the above exchange took place, Laux asked Brandon no further questions about the position of her legs. The tape-recorded interview shows that Brandon's description of the position of her legs during the rapes was in fact consistent.

The following exchange occurred when Laux questioned Brandon about Lotter's sexually assaulting her:

Q. After he got his pants down he got a spread of you, or had spread you out, and he got a spread of you then, then what happened?

A. When he finished he got out of the car and got back in the driver's door.

Q. Well, how did, ah, let's back up here for a second. First of all you didn't say anything about him getting it up. Did he have a hard on when he got back there or what?

A. I don't know. I didn't look.

Q. You didn't look. Did he take a little time working it up, or what? Did you work it up for him?

A. No, I didn't.

Q. You didn't work it up for him?

A. No.

Q. Then you think he had it worked up on his own, or what?

A. I guess so, I don't know.

Q. You don't know. . . . Did, when he got in the back seat you were already spread out back there ready for him, waiting on him.

A. No, I was sitting up when he got back there.

Laux questioned Brandon about her prior sexual experience in the following manner:

Q. And you have never had any sex before?

A. No.

Q. How old are you?

A. 21.

Q. And if you're 21, you think you'd have, you'd have, trouble getting it in?

A. Who me?

Q. Yeah.

A. I guess so. He was.

Laux further asked questions regarding Brandon's gender identity crisis such as, "Do you run around once in a while with a sock in your pants to make you look like a boy?" At one point during the interview, the following exchange took place:

Q. Why do you run around with girls instead of, ah, guys being you are a girl yourself?

A. Why do I what?

Q. Why do you run around with girls instead of guys beings you're a girl yourself? Why do you make girls think you're a guy?

A. I haven't the slightest idea.

Q. You haven't the slightest idea? You go around kissing other girls? . . . . [T]he girls that don't know about you, thinks [sic] you are a guy. Do you kiss them?

A. What does this have to do with what happened last night?

Q. Because I'm trying to get some answers so I know exactly what's going on. Now, do you want to answer that question for me or not?

A. I don't see why I have to.

Q. Huh?

A. I don't see why I have to.

Olberding: You, you don't have to answer. It's, this is all voluntary information.

Laux: The only thing is if it goes to court, that answer, that question is going to come up in court and I'm going to want an answer for it before it goes to court. See what I'm saying? I'm trying to have the answer there so we can try to avoid that question if it's not the answer I want to hear.

Brandon: 'Cause I have a sexual identity crisis.

Q. Your what?

A. I have a sexual identity crisis.

Q. You want to explain that?

A. I don't know if I can even talk about it . . . .

Brandon agreed to file complaints against Lotter and Nissen and agreed to testify against them. At the conclusion of the interview, Laux told Brandon, "I'm not trying to make it rough on you, but I've got to have the information that we need and the only way by getting that is asking some very personal questions."

Laux and Olberding then went to the location where Brandon claimed the rapes occurred. At that location, they recovered two condoms, a pair of rolled-up socks, and a beer can. These items were collected as evidence.

On December 25 and 26, 1993, statements were taken from Tisdel; Gutierres; Lotter's girl friend, Rhonda McKenzie; and Tisdel's sister, Leslie Mayfield. Each of these statements corroborated certain aspects of Brandon's account of the events of December 25. When Gutierres was at the sheriff's office on December 25 to give her statement, Laux again referred to Brandon as an "it" in a conversation with Gutierres.

On December 28, 1993, Nissen voluntarily went to the police station and, after being read his *Miranda* rights, gave a statement to Olberding and Hayes. Nissen admitted that he had pulled Brandon's pants down to determine her gender. He further revealed that during an argument at his house over Brandon's lying about her gender, he hit Brandon in the mouth and kicked Brandon in the back. He admitted that he, Lotter, and Brandon were at the location where Brandon claimed the rapes occurred, but denied that he had sexually assaulted Brandon.

On December 29, 1993, Brandon came to the sheriff's office and identified the socks which were found at the rape scene as hers. The sheriff's office requested that Brandon return that afternoon for another interview. However, when Brandon arrived at the courthouse that afternoon, Lotter and Nissen, who had not yet been arrested, were outside the courthouse, and Brandon did not go in. Law enforcement did not make any attempt to contact Brandon about the missed interview.

At the time Brandon reported the rapes, Laux was aware that Lotter and Nissen had criminal records. He was aware that Lotter had once escaped from custody in the middle of the day wearing an orange prison uniform and had had to be chased down by deputies. He knew that Lotter had been involved in a scuffle with a Missouri Highway Patrol officer, which resulted

in the officer's drawing his gun on Lotter. Laux knew that people in the community were afraid of Lotter. Laux also knew that Nissen had been incarcerated in the penitentiary.

The sheriff's office was also aware that Lotter and Nissen had threatened to harm Brandon if she reported the rapes. Gutierres informed Laux that Lotter and Nissen had threatened Brandon's life if she reported the rapes. Before the interview with Brandon was conducted, Gutierres told Laux that Brandon was "afraid," "feared for her life," and was "scared to death" because Lotter and Nissen had threatened Brandon's life. Tammy Schweitzer, Brandon's sister, called Laux on December 27, 1993, and informed him that Brandon was afraid that Lotter and Nissen would kill Brandon for reporting the rapes.

After the rapes, Brandon spoke to JoAnn over the telephone on several occasions. On December 25, 1993, Brandon told JoAnn that she was afraid to return to JoAnn's home in Lincoln because Lotter and Nissen had her address book and would be able to locate her at JoAnn's home. Brandon decided to stay with her friend Lambert at Lambert's house in rural Humboldt because Brandon believed that Lotter and Nissen did not know where Lambert lived.

On December 31, 1993, Brandon, Lambert, and Devine, another friend, were found murdered in Lambert's house. That same day, Lotter and Nissen were arrested for the December 25 sexual assaults on Brandon. Lotter and Nissen were later charged with and convicted of the three murders. See *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), and *State v. Nissen*, 252 Neb. 51, 560 N.W.2d 157 (1997).

On January 2, 1994, several of Brandon's family members, including Schweitzer, went to the sheriff's office to obtain information regarding Brandon's death and to retrieve some of Brandon's personal effects. At that time, they encountered Laux, who called Schweitzer a "bitch" and asked her "what kind of sister did [you] have?"

On April 19, 1994, JoAnn filed a claim under the Political Subdivisions Tort Claims Act. The 6-month period for the county and Laux to respond to the claim expired without a response. JoAnn then withdrew the claim and brought an action against the county and Laux, alleging that the county was negligent by fail-

ing to protect Brandon and that Laux's conduct during the December 25, 1993, interview constituted intentional infliction of emotional distress. The county filed a demurrer to JoAnn's second amended petition, which was sustained without further leave to amend. On appeal, this court reversed, determining that sufficient facts had been pled to qualify as an exception to the rule that law enforcement officials may not be held liable for failure to protect individual citizens from harm by criminal conduct. See *Brandon v. County of Richardson*, 252 Neb. 839, 566 N.W.2d 776 (1997) (*Brandon I*). We determined that if true, the facts pled established that a special relationship was created between Brandon and the county when Brandon went to law enforcement officials and offered to testify and aid the prosecution of Lotter and Nissen. *Id.* We also determined that JoAnn should have been granted leave to amend her petition with respect to the intentional infliction of emotional distress claim. *Id.*

JoAnn then filed a third amended petition, and trial to the court without a jury commenced on September 22, 1999. At trial, portions of Laux's deposition testimony were admitted and read into evidence. In this testimony, Laux admitted that Brandon told him that Lotter and Nissen had threatened her and that he was aware that Brandon was afraid. At trial, Laux testified that he never offered Brandon special protection from Lotter and Nissen. Laux also testified that his manner of questioning Brandon during the December 25, 1993, interview was due to concerns he had as to whether Brandon was being truthful. He questioned Brandon's credibility because she had been charged with forgery and had been deceiving people in the community as to her gender and because she was taking a long time to answer questions during the interview. However, Laux admitted that Brandon's gender identity disorder was not relevant to whether she had been raped.

Laux also testified that Brandon failed to return to the sheriff's office for the second December 29, 1993, interview that had been scheduled for Brandon and that the sheriff's office believed Brandon had gone back to Lincoln. A dispatcher at the sheriff's office testified that some time between December 25 and 31, she received a telephone call from Brandon stating that Brandon was going back to Lincoln.

Several law enforcement officers involved in investigating the rapes and surrounding events testified at trial. Olberding testified that Brandon appeared "frightened" and "traumatized" when she arrived for the December 25, 1993, interview. Olberding further stated that when Laux began questioning Brandon, Olberding left the room for a short time because he did not believe further questioning was necessary and "didn't think it was right to do that." Olberding testified that he was aware Lotter and Nissen had threatened Brandon, that he believed Brandon was telling the truth during the December 25 interview, and that he believed on December 28 that there was probable cause to arrest Lotter and Nissen. Olberding stated that Brandon was not keeping the sheriff's office advised of her whereabouts between December 25 and 31. However, Olberding also testified that the sheriff's office never offered Brandon any protection from Lotter and Nissen if she stayed in Richardson County.

Deposition testimony of John Caverzagie, who was assistant chief for the Falls City Police Department in 1993, was also admitted at trial. Caverzagie listened to the December 25 tape-recorded interview and testified that he believed that "just about everything" Laux said during the interview was "very unprofessional" and agreed that such conduct was outrageous. Hayes, the investigator who was present outside the interview room while the interview was being conducted, read the transcript of the interview and testified that Laux's questioning was "intimidating" and that he could think of no legitimate reason to question Brandon about her gender identity crisis. Hayes agreed that Laux's conduct during parts of the interview indicated that Laux was treating Brandon "as an accused rather than the victim."

Jack Wyant, a retired Nebraska State Patrol criminal investigator, testified as an expert witness for JoAnn. Wyant testified that in his opinion, based on the information that was available to law enforcement, an attempt should have been made to bring Brandon in for safekeeping if Lotter and Nissen were not arrested. Wyant further testified that even if he felt he was not getting truthful and accurate answers from an alleged rape victim, he could see no reason to be rude or abrasive while questioning the alleged victim.

A prosecutor who had prosecuted numerous sexual assault cases and had worked with law enforcement regarding sexual assault cases testified as an expert witness for the county. In preparing her testimony, the prosecutor reviewed the transcript of the December 25, 1993, interview. However, the majority of the prosecutor's testimony dealt with her opinion regarding the manner in which the county conducted the overall rape investigation, including whether Lotter and Nissen should have been arrested sooner. The prosecutor was not asked for her opinion and did not render an opinion as to whether Laux's conduct during the December 25 interview was extreme and outrageous.

A portion of the prosecutor's testimony on direct examination specifically related to Laux's conduct during the December 25, 1993, interview. That testimony consisted of the following:

"Q. . . . How would you characterize the interview by Sheriff Laux and Teena Brandon?"

. . . .

A. "My characterization of the interview was that it appeared to me that he was seeking her story, he was trying to get an idea of her version of events. He was trying to get detailed information from her about the chronology of events as well as what the events were.

"As I reviewed the transcript of that I found that he certainly used some language that I didn't find particularly appropriate. There were times when it appeared that he was using what I would consider locker room talk and that I think some would find offensive.

"But with respect to being confrontational necessarily with Teena Brandon, I didn't find that he was, quite frankly, as confrontational as many officers I've seen doing interviews with victims of sexual assault.

"I can honestly say that I have interviewed victims of sexual assault prior to trial, prior to preliminary hearings, prior to depositions and have been myself much more confrontational with them about areas where I might feel that they have been inconsistent or where they have given information that seems difficult to understand and may bear on areas where a defense attorney is going to make a big stink so to speak.

"Q. And you mentioned some of the language was not appropriate, could you give us a few examples?

"A. Oh, one that sticks out in my mind is he is asking her about the actual sexual assault itself by either Lotter or Nissen, I don't recall which one, and it may have been with both of them, where he says, okay, you're in the back, you're, and I don't recall what he says, he says you're spread and they're getting ready to poke you or something along that line.

"And I, those are seemingly not very sensitive terms to use when you're talking to somebody about an alleged sexual assault. That one stands out in my mind."

On cross-examination, the prosecutor acknowledged that prosecutors have a different role in the investigation and prosecution of sexual assault cases than do law enforcement officers. The prosecutor gave no testimony indicating that the interviews of sexual assault victims that she had witnessed were conducted within hours of the sexual assault incident. She admitted that she had never interviewed a rape victim immediately after the rape occurred. The prosecutor also testified that she was not informed that Olberding left the interview room at one point due to his disagreement with Laux's conduct during the interview. When asked if she would instruct officers to interrogate a rape victim in a manner similar to that used by Laux, the prosecutor stated, "I don't think some of the language he used was what I would suggest to anybody."

Mario Scalora, a licensed clinical psychologist and assistant professor of psychology at the University of Nebraska at Lincoln, testified as a psychological expert for JoAnn. Scalora had been licensed as a clinical psychologist since 1989 and had worked with 300 to 400 victims of sexual abuse. Scalora reviewed Brandon's mental health records, Brandon's criminal record, Brandon's medical records regarding the emergency room examination performed subsequent to the rapes, police reports relating to the rapes, the entire transcript of the December 25, 1993, interview, and a portion of the tape-recorded December 25 interview. Scalora also conducted interviews with JoAnn and Schweitzer regarding Brandon's history from infancy up to the time of her death.

Based on this information, Scalora testified that Brandon was the victim of childhood sexual abuse, which had a substantial and negative effect on how Brandon perceived her own sexuality. Scalora testified that Brandon subsequently developed gender identity disorder, which may have been related to her childhood sexual abuse. He further testified that Brandon was "very negatively impacted" by the rapes Lotter and Nissen committed upon her. Regarding the impact of Laux's conduct during the December 25, 1993, interview, Scalora testified that considering Brandon's history, Brandon had "very open emotional sores" upon arriving at the December 25 interview. When asked for his opinion regarding what impact Laux's behavior during the December 25 interview had on Brandon, Scalora testified that "the interrogation had a significant negative effect on this woman." Scalora testified that Brandon's responses during the interview indicated that she believed she was not being taken seriously. Scalora further testified that considering the fact that Brandon had been raped just hours before the interview was conducted, "that type of interrogation process . . . is like pouring . . . vinegar on an open wound."

JoAnn also testified regarding Brandon's reaction to the December 25, 1993, interview. JoAnn testified that she spoke with Brandon on the telephone almost every day after the rapes. She described Brandon as "emotionally dead" during those conversations. JoAnn testified that Brandon told her that Laux was "more concerned about her identity crisis than he was about the rape" and that she was "scared" of Laux "[b]ecause of the way he was towards her."

JoAnn further testified that she had a close relationship with Brandon. JoAnn described Brandon as an "outgoing and happy" child. Schweitzer testified that her and Brandon's father was killed in a car accident before Brandon was born and that she and Brandon had a close relationship with their mother because "it was just the three of us all the time, so we had nobody but each other." Pat Brayman, Brandon's aunt, testified that Brandon "loved her mom dearly and she let her mother know that she loved her." JoAnn and Schweitzer testified that Brandon spent every Christmas with her family. A booklet of drawings and photographs documenting Brandon's life from infancy to young adulthood was admitted into evidence. Photographs in

the booklet depict Brandon's participation in family gatherings and other activities.

JoAnn testified that she began witnessing changes in Brandon at age 17 when Brandon began wearing masculine hair and clothing styles. JoAnn testified that when Brandon began portraying herself as a male, JoAnn discussed this issue with Brandon but often "didn't know what to say." JoAnn also attended counseling with Brandon. JoAnn testified that after Brandon began presenting herself as a man, Brandon became more distant from her family but still maintained contact. JoAnn testified that Brandon would call, stop by, or leave a rose in the door for JoAnn.

JoAnn also testified that Brandon was interested in becoming a commercial artist and had applied to the Colorado Institute of Art. After Brandon's death, JoAnn received a letter that Brandon's application had been accepted. JoAnn also stated that after the rapes occurred, Brandon told JoAnn that she wanted to come back to Lincoln and "get things back together" and "get her life back." Brandon told JoAnn that Brandon planned to return to Lincoln on January 3, 1994.

On December 6, 1999, the district court issued a "Memorandum Finding," determining that the county had a duty to protect Brandon due to the special relationship between the county and Brandon which was created when Brandon agreed to assist the county by testifying against Lotter and Nissen. The court determined that the county was negligent in that it failed to take measures to protect Brandon. The court awarded economic damages of $6,223.20 and noneconomic damages of $80,000 for Brandon's predeath pain and suffering. However, the court determined that Brandon herself was negligent and that the damage award should be reduced by 1 percent for such negligence. The court did not specifically state how Brandon was negligent. The court further reduced the damage award by 85 percent, allocating that percentage to the intentional torts of Lotter and Nissen. Thus, the court determined that the county was responsible for 14 percent of the noneconomic damages. The court entered judgment against the county for a total of $17,360.97.

The court denied recovery on the intentional infliction of emotional distress claim, determining that Laux's conduct was not extreme and outrageous because "the evidence does not

reach such high status" and that in addition there was "a failure to prove that [Brandon] suffered" as a result of Laux's conduct.

The court further determined that "the major award arises under [JoAnn]'s cause for pre-death pain and suffering." The court then stated that Brandon's "history does not support likely contributions of money to anyone" and that JoAnn, as Brandon's next of kin, was entitled to "nominal damages" for loss of society, comfort, and companionship. Interpreting the order as a whole, we conclude that the award of "nominal damages" was in effect an award of zero damages.

JoAnn appeals, and the county cross-appeals.

## ASSIGNMENTS OF ERROR

JoAnn claims the district court erred in (1) reducing the damage award by 85 percent due to the intentional torts of Lotter and Nissen; (2) determining that Laux's conduct during the December 25, 1993, interview was not extreme and outrageous and that JoAnn failed to prove Brandon suffered severe emotional distress as a result of the conduct; (3) awarding "nominal damages" for loss of society, comfort, and companionship; and (4) determining that Brandon was negligent and reducing the damage award by 1 percent due to such negligence.

The county claims the district court erred in determining that the county was negligent.

## STANDARD OF REVIEW

■ To the extent an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent conclusion irrespective of the determination made by the court below. *Essen v. Gilmore*, 259 Neb. 55, 607 N.W.2d 829 (2000).

■ In a bench trial of an action at law, the factual findings by the trial court have the effect of a jury verdict and will not be set aside unless they are clearly wrong. *Strategic Staff Mgmt. v. Roseland*, 260 Neb. 682, 619 N.W.2d 230 (2000). When reviewing the sufficiency of the evidence to sustain a judgment, every controverted fact must be resolved in favor of the successful party, and such party is entitled to the benefit of every inference that can reasonably be deduced from the evidence. *Baldwin v. City of Omaha*, 259 Neb. 1, 607 N.W.2d 841 (2000).

## ANALYSIS

### ALLOCATION OF DAMAGES

JoAnn first claims that the district court erred in its application of Neb. Rev. Stat. § 25-21,185.10 (Reissue 1995), by allocating 85 percent of the damages to the intentional torts of Lotter and Nissen, thereby reducing the judgment against the county for noneconomic damages by 85 percent. JoAnn claims the court impermissibly shifted liability from the county, a negligent tort-feasor, to Lotter and Nissen, intentional tort-feasors.

Statutory interpretation presents a question of law, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *Philpot v. Aguglia,* 259 Neb. 573, 611 N.W.2d 93 (2000). In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning; an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Id.*

Section 25-21,185.10 provides in relevant part:

> In any other action involving more than one defendant, the liability of each defendant for economic damages shall be joint and several and the liability of each defendant for noneconomic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of noneconomic damages allocated to that defendant in direct proportion to that defendant's percentage of negligence, and a separate judgment shall be rendered against that defendant for that amount.

JoAnn claims this section provides for allocation of damages among negligent tort-feasors only and does not allow for such allocation due to the acts of intentional tort-feasors. We determine that JoAnn's assertion is correct.

Nebraska's comparative negligence law, Neb. Rev. Stat. §§ 25-21,185 to 25-21,185.12 (Reissue 1995), applies only to civil actions in which contributory negligence is a defense. § 25-21,185.07. This court has previously recognized that contributory negligence is not a defense to an intentional tort. " '[W]here the defendant's conduct is actually intended to inflict

harm upon the plaintiff, there is a difference, not merely in degree but in the kind of fault; and the defense [contributory negligence] never has been extended to such intentional torts.'" *Omaha Nat. Bank v. Manufacturers Life Ins. Co.*, 213 Neb. 873, 881-82, 332 N.W.2d 196, 202 (1983), quoting William L. Prosser, Handbook of the Law of Torts § 65 (4th ed. 1971). Furthermore, § 25-21,185.10 provides that "[e]ach defendant shall be liable only for the amount of noneconomic damages allocated to that defendant in direct proportion to that defendant's percentage of *negligence* . . . ." (Emphasis supplied). Section 25-21,185.10 does not provide for allocation of damages to a defendant for his or her intentional torts. The plain language of Nebraska's comparative negligence law does not allow for allocation of damages to intentional tort-feasors.

Negligent and intentional torts are different in degree, in kind, and in society's view of the relative culpability of each act. *Turner v. Jordan*, 957 S.W.2d 815 (Tenn. 1997). See, also, *Welch v. Southland Corp.*, 134 Wash. 2d 629, 635, 952 P.2d 162, 166 (1998) (recognizing negligent and intentional torts are of "'wholly different legal realm'"); *Merrill Crossings Associates v. McDonald*, 705 So. 2d 560, 562 (Fla. 1997) (negligent acts are "'fundamentally different'" from intentional acts); *Veazey v. Elmwood Plantation Associates, Ltd.*, 650 So. 2d 712, 719 (La. 1994) (recognizing intentional torts are of "fundamentally different nature" than negligent torts). Because of these differences, allowing allocation of damages between negligent and intentional tort-feasors presents practical difficulties. *Turner, supra.* Fact finders are likely to allocate most, if not all, of the damages to the intentional tort-feasor due to the higher degree of social condemnation attached to intentional, as opposed to negligent, torts. *Id.* Thus, allocation of a percentage of the damages to an intentional tort-feasor reduces the negligent party's incentive to comply with the applicable standard of care. *Id.* See, also, *Veazey, supra.* Furthermore, it would be irrational to allow a party who negligently fails to discharge a duty to protect to reduce its liability because there is an intervening intentional tort when the intervening intentional tort is exactly what the negligent party had a duty to protect against. *Merrill Crossings Associates, supra.* See, also, *Turner, supra*; *Kansas State Bank*

*& Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 819 P.2d 587 (1991).

Other courts have concluded that allocation of damages to intentional tort-feasors is not allowed under comparative negligence law. See, *Whitehead v. Food Max of Mississippi, Inc.*, 163 F.3d 265 (5th Cir. 1998); *Welch, supra*; *Merrill Crossings Associates, supra*; *Turner, supra*; *Veazey, supra*; *McLean v. Kirby Co.*, 490 N.W.2d 229 (N.D. 1992); *Kansas State Bank & Tr. Co., supra*. Several of these courts have simply determined, as we have, that the plain meaning of their statutes does not authorize allocation of damages to intentional tort-feasors. *Whitehead, supra*; *Welch, supra*; *Merrill Crossings Associates, supra*; *McLean, supra*.

For these reasons, we determine the trial court erred in allocating 85 percent of the noneconomic damages to the intentional torts of Lotter and Nissen.

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

JoAnn next claims the trial court erred in denying recovery for intentional infliction of emotional distress. JoAnn claims the trial court erred in determining that Laux's conduct during the December 25, 1993, interview was not extreme and outrageous and in finding that JoAnn failed to prove that Brandon suffered as a result of Laux's conduct.

This court has long held that three elements must be alleged and proved before a plaintiff can recover on a cause of action for intentional infliction of emotional distress. *Iwanski v. Gomes*, 259 Neb. 632, 611 N.W.2d 607 (2000). To recover for intentional infliction of emotional distress, a plaintiff must prove the following: (1) that there has been intentional or reckless conduct, (2) that the conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community, and (3) that the conduct caused emotional distress so severe that no reasonable person should be expected to endure it. *Id.*; *Brandon I*. A claim for intentional infliction of emotional distress survives the death of the victim. *Brandon I*. The parties in the present case have not raised any issues regarding whether the first element of the tort, intentional

or reckless conduct, had been met. The dispute is to the second and third elements.

Regarding the second element of the tort, it is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery or whether it is necessarily so. Restatement (Second) of Torts § 46, comment *h*. (1965). See, also, *Behringer v. Behringer*, 884 S.W.2d 839 (Tex. App. 1994). Only if reasonable minds may differ does the fact finder then determine whether the conduct in a particular case is sufficiently extreme and outrageous as to result in liability. Restatement, *supra*. See, also, *Behringer, supra*. The district court in the present case determined that Laux's conduct during the December 25, 1993, interview was not extreme and outrageous, stating that "the evidence does not reach such high status." The district court further stated that Laux's conduct was "reasonable and necessary to prepare [Brandon] to testify at public trial in the face of confrontation by and on behalf of Nissen and Lotter."

It is unclear whether the district court found the evidence of outrageous conduct to be insufficient as a matter of fact or as a matter of law. However, we determine, as set forth below, that the material facts are undisputed and that Laux's conduct was extreme and outrageous as a matter of law.

Whether conduct is extreme and outrageous is judged on an objective standard based on all the facts and circumstances of the particular case. *Doe v. Calumet City*, 161 Ill. 2d 374, 641 N.E.2d 498, 204 Ill. Dec. 274 (1994). In determining whether certain conduct is extreme and outrageous, the relationship between the parties and the susceptibility of the plaintiff to emotional distress are important factors to consider. *Drejza v. Vaccaro*, 650 A.2d 1308 (D.C. 1994). Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities that result from living in society do not rise to the level of extreme and outrageous conduct. Restatement, *supra*, comment *d*. However, conduct which might otherwise be considered merely rude or abusive may be deemed outrageous when the defendant knows that the plaintiff is particularly susceptible to emotional distress. *Doe, supra*. See, also, Restatement, *supra*, comment *f*.

■ The extreme and outrageous character of conduct may also arise from the abuse of a position of power. *Doe, supra.* See, also, Restatement, *supra*, comment *e.* The Restatement specifically mentions police officers among those who may be held liable for intentional infliction of emotional distress due to abuse of their position. Restatement, *supra.* See, also, *Doe, supra.*

In considering the relationship between the parties in the present case, the record shows that prior to conducting the interview, Laux had developed a negative attitude toward Brandon because of her gender identity disorder. Laux's reference to Brandon as an "it" when Brandon was housed in the jail on December 15, 1993, reflects this negative attitude. Laux again referred to Brandon as an "it" on the very day the interview was conducted. Laux's comment to Schweitzer, asking her "what kind of sister did [you] have?" reflects that this attitude continued even after Brandon's death. The record further reflects that Laux, as a law enforcement official, was in a position of power in relation to Brandon, the victim of a crime who sought assistance from law enforcement.

Furthermore, Brandon was in a particularly vulnerable emotional state at the time the interview was conducted, having been beaten and raped earlier that day. See *Drejza, supra* (being victim of rape, standing alone, is enough to demonstrate particularly vulnerable emotional condition). At the time the interview was conducted, Laux knew that Brandon had been beaten as the results of the beating were readily visible on Brandon's face. Laux knew that the hospital examination showed that Brandon had been sexually penetrated. Laux was informed prior to conducting the interview that Brandon was "afraid," "feared for her life," and was "scared to death" because Lotter and Nissen had threatened Brandon. Laux was also aware that Brandon was upset and crying during the interview.

Despite this knowledge, Laux proceeded to use crude and dehumanizing language during the entire interview. Examples of such language include statements such as "they got ready to poke you," "sinking it in your vagina," "stuck it in your box or in your buttocks," "he got a spread of you," "had spread you out," and "was he fingering you?"

At several points during the interview, Laux expressed disbelief at what Brandon was telling him, through both verbal statements and his tone of voice. Laux told Brandon that he "can't believe" that Lotter did not "stick his hand in you or his finger in you" during the incident in which Lotter and Nissen pulled down Brandon's pants. He accused Brandon of giving differing accounts regarding the position of her legs during the rapes when in fact Brandon's accounts were consistent. He expressed disbelief that Brandon could be 21 years old and yet the rapists would have "trouble getting it in."

Some of Laux's statements indicate a belief that Brandon willingly participated in the sexual acts, such as "[d]id you work it up for him?" (referring to the rapist's penis) and "you were already spread out back there ready for him, waiting on him." Laux asked other questions which expressed simply a prurient interest in the rapes, including: "[D]id it feel like he stuck it in very far or not?"; "Did he have a hard on when he got back there or what?"; "Did he take a little time working it up . . . ?"; and "Did he play with your breasts or anything?"

Laux also asked questions that were entirely irrelevant as to whether Brandon had been raped, such as "Did he tell you anything about this is how they do it in the penitentiary?" and "Was he enjoying it? Did he think it was funny?" Laux proceeded to question Brandon about her gender identity disorder, asking her if she had kissed other girls, which had nothing to do with the situation under investigation. Olberding even interjected at this point, telling Brandon that she did not have to answer the questions Laux was asking about her gender identity disorder. Laux himself admitted at trial that Brandon's gender identity disorder had nothing to do with whether Brandon had been raped.

The tone used during the interview is also something to be considered in determining the outrageousness of Laux's conduct. See *Drejza v. Vaccaro*, 650 A.2d 1308 (D.C. 1994). The tape recording reveals that Laux's tone throughout the interview was demeaning, accusatory, and intimidating. The tone in which many of the questions were asked expressed Laux's disbelief of what Brandon was telling him and that Laux was not taking Brandon seriously.

The above-discussed facts are not in dispute. There is no question that Laux was in a position of authority in relation to Brandon and that Laux knew Brandon was in a particularly vulnerable emotional state prior to conducting the interview. The facts of what happened during the actual interview itself are also not subject to dispute because the tape recording provides a record of exactly what was said during the interview and the manner in which those words were said.

The county does not dispute these facts, but attempts to justify Laux's conduct, claiming that Laux was pursuing the legitimate objectives of clarifying inconsistencies in Brandon's account, fact finding, and preparing Brandon to testify against Lotter and Nissen at trial. Laux also claimed that his manner of questioning Brandon was due, in part, to the fact that Brandon was taking a long time to answer questions. However, these justifications do not withstand scrutiny. A review of the tape recording reveals that Brandon's answers were spontaneous and were given without hesitation. Having listened to the tape-recorded interview, we also find no instances in which Laux attempted to clarify any actual inconsistencies in Brandon's account. Furthermore, the questions Laux asked which were entirely irrelevant to whether the rapes had occurred and that expressed simply a prurient interest in the rapes can hardly be said to constitute legitimate "fact finding."

Any claim that Laux was preparing Brandon to testify at trial is also not persuasive. The interview in the present case occurred only hours after Brandon was beaten and raped. The alleged perpetrators had not yet been arrested and there was no imminent trial to prepare for at that point. As stated in *Drejza*, 650 A.2d at 1315 n.18:

> As a matter of common sense, an interview with a distraught rape victim an hour or so after her ordeal ended was hardly the occasion for a detective . . . to question her like a defense attorney or a prosecutor, to try to assess her ability to withstand potential humiliating aspects of a criminal trial, or to challenge her intention to press charges. Such an inquiry could be conducted at a later date, preferably by a prosecutor, after the victim had been given a reasonable amount of time to regain control over her emotions

and faculties. . . . It would surely be reasonable for her not to expect to be challenged or belittled, almost as soon as she arrived, by the very authorities whose assistance she was requesting.

Not only do the justifications offered by the county for Laux's conduct not withstand scrutiny, such justifications do not change the undisputed facts regarding the circumstances under which the interview was conducted or what occurred during the interview as revealed by the tape recording. These justifications are simply the county's interpretation of the undisputed facts.

Likewise, the testimony given by the prosecutor who testified on behalf of the county was only a "characterization" of the undisputed underlying facts. The prosecutor rendered no opinion as to whether Laux's conduct during the interview was extreme and outrageous. When asked to "characterize" Laux's conduct during the interview, the prosecutor testified that Laux's conduct was less "confrontational" than the conduct of many officers she had witnessed interviewing sexual assault victims. However, many of Laux's statements and questions, such as "did it feel like he stuck it in very far or not?"; "[d]id he tell you anything about this is how they do it in the penitentiary?"; "[w]as he enjoying it?"; "[d]id he think it was funny?"; "[d]id he have a hard on when he got back there or what?"; "[d]id you work it up for him?"; and "when he got in the back seat you were already spread out back there ready for him, waiting on him," neither challenge nor test Brandon's version of the events. Such questions exhibit simply a prurient interest in the rapes and are not relevant to whether Brandon had been raped. Furthermore, the prosecutor gave no testimony regarding whether the interviews she had witnessed had occurred within hours of the sexual assault of the victim, as did the interview conducted by Laux.

The prosecutor further testified that she had been much more confrontational than Laux when interviewing rape victims regarding areas where the victim might have been inconsistent. However, in the present case, there are no instances in which Laux attempted to clarify any actual inconsistencies in Brandon's account. Additionally, the prosecutor testified that the interviews she conducted occurred prior to depositions, preliminary hearings, and trials and that she had never interviewed a rape victim

shortly after the rape occurred. Such testimony is consistent with the fact that the role of a prosecutor in preparing a rape victim to testify at trial is different from the role of a law enforcement officer questioning the victim shortly after the rape occurred.

Furthermore, of critical importance is the fact that the record does not show that the prosecutor listened to the actual tape recording of the December 25, 1993, interview. The record makes reference only to her review of the transcribed interview. There is no testimony from the prosecutor regarding Laux's tone during the interview, which is very significant in determining whether Laux's conduct was extreme and outrageous.

Every law enforcement officer who testified in this case testified as to the inappropriateness of Laux's conduct. Olberding, who was present during the interview, left the interview at one point because he disagreed with the way Laux was conducting the interview and interjected at another point during the interview, telling Brandon that she did not have to answer questions about her gender identity disorder. Caverzagie, a law enforcement officer who listened to the tape-recorded interview, testified that he believed that "just about everything" Laux said during the interview was "very unprofessional" and agreed that such conduct was outrageous.

Based upon the undisputed facts in this case, we determine as a matter of law that Laux's conduct was extreme and outrageous, beyond all possible bounds of decency, and is to be regarded as atrocious and utterly intolerable in a civilized community. The district court erred in not so holding.

 Although the district court determined that Laux's conduct was not extreme and outrageous, the district court nevertheless went on to find that JoAnn had failed to prove the third element of intentional infliction of emotional distress—that Brandon suffered as a result of Laux's conduct. Liability arises for intentional infliction of emotional distress only when emotional distress has in fact resulted and is severe. *Hassing v. Wortman*, 214 Neb. 154, 333 N.W.2d 765 (1983); Restatement (Second) of Torts § 46, comment *j*. (1965). Whether severe emotional distress can be found is a question of law; whether it existed in a particular case is a question of fact. Restatement, *supra*.

■ Although outrageous conduct and severe emotional distress are separate elements of the tort of intentional infliction of emotional distress, the two are related. *American Medical Intern. v. Giurintano*, 821 S.W.2d 331 (Tex. App. 1991). The extreme and outrageous character of the conduct is itself important evidence that severe emotional distress existed on account of the conduct. Restatement, *supra.* See, also, *Brower v. Ackerley*, 88 Wash. App. 87, 943 P.2d 1141 (1997); *Behringer v. Behringer*, 884 S.W.2d 839 (Tex. App. 1994); *American Medical Intern., supra.*

The district court's erroneous determination that Laux's conduct was not extreme and outrageous effectively removed from the fact finder's consideration important evidence bearing on the question of whether Brandon sustained emotional distress, that being *the extreme and outrageous character of the conduct itself.* The extreme and outrageous character of Laux's conduct during the interview, as discussed previously, is itself important evidence that Brandon, a distraught rape and physical assault victim, suffered as a result of Laux's conduct. The district court failed to consider this evidence in determining whether Brandon suffered severe emotional distress as a result of Laux's conduct.

Since we have determined that Laux's conduct was extreme and outrageous, such conduct, in addition to the other evidence that was adduced on this issue, must now be considered by the trial court as bearing upon the factual determination of whether severe emotional distress existed in this particular case. Because the trial court failed to consider this evidence, the issue of whether Laux's conduct caused Brandon to suffer emotional distress so severe that no reasonable person should be expected to endure it must be remanded to the district court. If the court finds that Brandon did not suffer severe emotional distress or that Laux's conduct was not a proximate cause of any severe emotional distress Brandon may have suffered, JoAnn may not recover on her claim for intentional infliction of emotional distress. If the court finds that Brandon suffered severe emotional distress and that Laux's conduct was a proximate cause of such emotional distress, the court shall award damages for intentional infliction of emotional distress.

### Nominal Damage Award on Loss of Society Claim

JoAnn claims the district court erred in determining that she was entitled to "nominal damages" for loss of society, comfort, and companionship. As stated previously, we interpret the district court's award of "nominal damages" as an award of zero damages.

This court has consistently recognized that in an action for wrongful death of a child, recoverable damages include parental loss of the child's society, comfort, and companionship. *Reiser v. Coburn*, 255 Neb. 655, 587 N.W.2d 336 (1998); *Williams v. Monarch Transp.*, 238 Neb. 354, 470 N.W.2d 751 (1991). See, also, *Crewdson v. Burlington Northern RR. Co.*, 234 Neb. 631, 452 N.W.2d 270 (1990); *Selders v. Armentrout*, 190 Neb. 275, 207 N.W.2d 686 (1973). " 'The term "society" embraces a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection.' " *Williams*, 238 Neb. at 359, 470 N.W.2d at 755.

When a child is wrongfully killed, a parent's investment in that child of money, affection, guidance, security, and love is destroyed. *Reiser, supra; Williams, supra.* Destruction of such value is recognized whether the child is a minor or an adult. *Reiser, supra; Williams, supra.* Parental loss is not limited to or necessarily dependent upon deprivation of the child's monetary contribution toward parental well-being. *Reiser, supra; Williams, supra.*

Damages for loss of society must be determined upon a consideration of the facts of each case. *Reiser, supra; Williams, supra.* There is no exact fiscal formula for determination of damages recoverable for loss of society, comfort, and companionship, a loss which is not subject to some strict accounting method based on monetary contributions, past or prospective. *Reiser, supra; Williams, supra.* Because it is impossible to generalize the extent to which persons enjoy each other's companionship and society, the value of such highly personal relationships must be decided on a case-by-case basis. *Williams, supra.*

In *Reiser*, this court recognized that the relationship between parent and child has "intrinsic value" and reversed an award of zero damages for loss of society in the wrongful death

of an 18-year-old. Because the parent-child relationship has intrinsic value, once a parent-child relationship is proved to exist, destruction of that relationship through the wrongful death of the child entitles the parent, who is the surviving next-of-kin, to damages. See *Reiser, supra.* Evidence regarding the quality and extent of the parent-child relationship may then be utilized in determining the amount of those damages. See, *Reiser, supra*; *Williams, supra.* The amount of damages is a matter solely for the fact finder, whose action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of damages proved. *Norman v. Ogallala Pub. Sch. Dist.*, 259 Neb. 184, 609 N.W.2d 338 (2000).

JoAnn testified that she had a close relationship with Brandon. Schweitzer testified that she and Brandon had a close relationship with JoAnn because "we had nobody but each other." Brayman, Brandon's aunt, testified that Brandon "loved her mom dearly and she let her mother know that she loved her." Brandon spent every Christmas with her family.

Although JoAnn often "didn't know what to say" when Brandon began experiencing her sexual identity crisis, JoAnn and Brandon did discuss the issue. JoAnn also attended counseling with Brandon. Even after Brandon began presenting herself as a man, Brandon would call JoAnn, stop by to see her, or leave a rose in the door for her. Brandon spoke to JoAnn nearly every day on the telephone after the rapes occurred. Brandon was interested in becoming a commercial artist, and Brandon told JoAnn that she wanted to come back to Lincoln and "get her life back."

The record in the present case shows that a relationship between JoAnn and Brandon did indeed exist. The county does not assert that there was no relationship between JoAnn and Brandon. The county asserts that the award of "nominal damages" was reasonable because JoAnn's relationship with Brandon was "strained and undeveloped" due to Brandon's legal troubles and gender identity disorder. Brief for appellee at 23. However, Brandon's personal problems are relevant only to the extent that they impacted her relationship with JoAnn. Damages for loss of society are not necessarily dependent on the personal qualities of the child. We have previously recognized that "[w]e will not enter into a discussion in which we compare the relative

accomplishments of deceased children in wrongful death actions." *Caradori v. Fitch*, 200 Neb. 186, 194, 263 N.W.2d 649, 655 (1978). See, also, *Brahatcek v. Millard School District*, 202 Neb. 86, 273 N.W.2d 680 (1979).

█ The county's argument addresses the extent and quality of the relationship between JoAnn and Brandon, not whether such relationship existed. Contrary to the county's assertion, the parent-child relationship has intrinsic value, even if that relationship is less than perfect. A parent-child relationship may exist in spite of any personal problems the child might have, as the record in this case demonstrates. In recognizing the "intrinsic value of the relationship between parent and child," as we did in *Reiser v. Coburn*, 255 Neb. 655, 664, 587 N.W.2d 336, 342 (1998), we conclude that an award of $0 for the loss of Brandon's society, comfort, and companionship sustained by JoAnn as a result of Brandon's death bears no reasonable relationship to the evidence and shocks the conscience. The award of $0 on JoAnn's loss of society claim is therefore inadequate as a matter of law.

### FINDING OF NEGLIGENCE AGAINST BRANDON

In her final assignment of error, JoAnn asserts that the district court erred in finding that Brandon was contributorily negligent. The court reduced the damage award by 1 percent due to such negligence. The district court made no specific finding as to how Brandon was negligent.

█ Negligence must be measured against the particular set of facts and circumstances which are present in each case. *Norman v. Ogallala Pub. Sch. Dist.*, 259 Neb. 184, 609 N.W.2d 338 (2000). A plaintiff is contributorily negligent if (1) he or she fails to protect himself or herself from injury, (2) his or her conduct concurs and cooperates with the defendant's actionable negligence, and (3) his or her conduct contributes to his or her injuries as a proximate cause. *Nickell v. Russell*, 260 Neb. 1, 614 N.W.2d 349 (2000); *Carroll v. Chase County*, 259 Neb. 780, 612 N.W.2d 231 (2000); *Baldwin v. City of Omaha*, 259 Neb. 1, 607 N.W.2d 841 (2000). Whether contributory negligence is present in a particular case is a question for the trier of fact. *Harrison v. Seagroves*, 250 Neb. 495, 549 N.W.2d 644 (1996).

Although the district court stated no basis for its finding that Brandon was negligent, the county asserts several bases which the county claims support a finding that Brandon was negligent. The county first asserts that Brandon failed to give consistent, complete, and accurate statements to law enforcement, including failing to report that Lotter and Nissen had threatened her life. However, this assertion is not supported by the record. The record shows that the information Brandon provided was generally consistent, complete, and accurate and was additionally supported by statements given by witnesses and by physical evidence. The claim that Brandon never told law enforcement that Lotter and Nissen threatened her life is also not supported by the record. Although the tape-recorded interview itself does not contain a statement by Brandon regarding the threat, Laux admitted that Brandon told him that Lotter and Nissen had threatened her.

The county next alleges Brandon failed to keep the sheriff's office accurately informed as to her whereabouts and failed to return for the second interview on December 29, 1993. However, the evidence does not demonstrate how Brandon's conduct in failing to keep the sheriff's office accurately informed as to her whereabouts and failing to return for the second December 29 interview concurred and cooperated with the county's negligence. The county was negligent by failing to protect Brandon. The record is absolutely clear that there was never any plan to provide protection to Brandon, which would require her to keep law enforcement accurately informed as to her whereabouts. Furthermore, nothing in the record indicates that Brandon's failure to return for the second December 29 interview contributed to the county's failure to protect Brandon. The record also indicates that when Brandon arrived at the courthouse for the second December 29 interview, Lotter and Nissen were outside, so Brandon did not go in.

The record further fails to show that Brandon's conduct contributed to the injury as a proximate cause. A proximate cause is a cause (1) that produces a result in a natural and continuous sequence and (2) without which the result would not have occurred. *Norman, supra.* The record does not show that had Brandon kept law enforcement accurately informed of her

whereabouts or returned for the second interview on December 29, 1993, the result would have been different. The record shows that the county took no action to protect Brandon and had no plan to do so, regardless of Brandon's whereabouts or whether she returned for the second December 29 interview.

We find no evidence in the record to support a finding that Brandon was contributorily negligent. The district court's finding of 1 percent contributory negligence against Brandon was clearly wrong.

## CROSS-APPEAL

In its cross-appeal, the county claims the district court erred in finding the county negligent. The county first claims that there was no special relationship between the county and Brandon and that, therefore, the county did not have a duty to protect Brandon.

In *Brandon I*, we noted that exceptions exist to the general rule that law enforcement officials may not be held liable for failure to protect individual citizens from criminal acts. One such exception to this "no-duty rule" is when there is a special relationship between the individual and law enforcement because the individual has agreed to aid law enforcement officials in the performance of their duties. *Id.* In *Brandon I*, we stated:

> We conclude that Brandon has stated facts sufficient to qualify for an exception to the no-duty rule because the victim witnessed a crime and agreed to aid the police. A special relationship was created when the victim went to law enforcement officials and offered to testify and aid in the prosecution of Lotter and Nissen.

252 Neb. at 844, 566 N.W.2d at 780. The fact that Brandon went to law enforcement and offered to testify and aid in the prosecution of Lotter and Nissen was proved at trial. There was a special relationship between the county and Brandon, and therefore the county had a duty to protect Brandon. The county's argument that it did not have a duty to protect Brandon is without merit.

The county next claims that it discharged the duty to protect Brandon by "conducting a reasonable investigation of her rape." Brief for appellee at 32. However, the specific finding of negli-

gence against the county was its failure to protect Brandon. Because of its special relationship with Brandon, the county had a duty to Brandon beyond simply performing a reasonable investigation of her complaint. The fact that the county conducted a reasonable investigation of the rape allegations does not demonstrate that the county discharged its duty to protect Brandon from the danger posed by Lotter and Nissen.

The county further claims that the district court's specific findings of negligence against the county were not a proximate cause of Brandon's death. The district court determined the county should have (1) investigated Brandon's location, (2) offered Brandon transportation to Lincoln and the relative safety of her family, (3) offered Brandon protective custody, and (4) arranged an interview for Brandon with social services. The district court found it unreasonable for the county to not make such an effort and that "its lack of effort and failure was a violation of its duty to protect [Brandon.]" The county claims that its failure to take any of the above-mentioned actions was not a proximate cause of Brandon's death because had any of those actions been taken, the result would have been no different.

██ As stated previously, a proximate cause is a cause that produces a result in a natural and continuous sequence, and without which the result would not have occurred. *Norman v. Ogallala Pub. Sch. Dist.*, 259 Neb. 184, 609 N.W.2d 338 (2000); *Baldwin v. City of Omaha*, 259 Neb. 1, 607 N.W.2d 841 (2000). Determination of causation is ordinarily a matter for the trier of fact. *Baldwin, supra.*

The record in this case is clear that the county did nothing to discharge its duty to protect Brandon from the threat posed by Lotter and Nissen. The complete lack of protection by the county left Brandon vulnerable to Lotter and Nissen, who followed through on their threats and murdered Brandon. Based on the record, we conclude that the district court did not err in determining that the county's negligence was a proximate cause of Brandon's death.

Lastly, the county claims JoAnn's third amended petition, upon which the case was tried, did not include an allegation that the county was negligent in failing to protect Brandon, but alleged only that the county was negligent by failing to arrest

Lotter and Nissen. The record shows that the pleadings were amended to conform to the proof at trial. The county does not argue or assign any error claiming that such amendment was improper. The county contends that even after the pleadings were amended to conform to the proof at trial, the pleadings did not include an allegation that the county was negligent in failing to protect Brandon. However, the record clearly shows that these amendments did include an allegation that the county was negligent in failing to protect Brandon, stating that the county breached its duty to Brandon "by failing to arrest Lotter and Nissen and to protect Brandon from them."

The county's assignment of error is without merit.

## CONCLUSION

We affirm the district court's determination that the county had a duty to protect Brandon, its finding that the county was negligent in failing to discharge that duty, and its finding that Brandon suffered predeath pain and suffering damages in the amount of $80,000.

We reverse the district court's allocation of 85 percent of the predeath pain and suffering damages to the intentional torts of Lotter and Nissen as Nebraska's comparative negligence law does not allow for allocation of damages to the acts of intentional tort-feasors. We also reverse the district court's determination that Laux's conduct during the December 25, 1993, interview was not extreme and outrageous. We further reverse the district court's award of "nominal damages" for loss of society, comfort, and companionship and its finding that Brandon was 1 percent contributorily negligent.

We therefore remand this cause to the district court (1) for a determination of whether JoAnn has proved that Brandon suffered emotional distress so severe that no reasonable person should be expected to endure it and, if so, whether Laux's conduct was a proximate cause of any such distress; (2) to award damages for intentional infliction of emotional distress if JoAnn has proved both that Brandon suffered severe emotional distress and that Laux's conduct was a proximate cause of that distress; and (3) for a determination of the amount of damages for loss of society.

Upon remand, the district court shall not reduce the award of $80,000 for Brandon's predeath pain and suffering or reduce any additional amounts that may be awarded for loss of society or intentional infliction of emotional distress by allocating a percentage of the damage to intentional acts on the part of Lotter and Nissen. Further, as there is no evidence to support a finding of negligence on the part of Brandon, the district court shall not reduce any damages awarded to JoAnn due to any acts of Brandon.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.