RENDERED: DECEMBER 16, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0539-DG

LOUISVILLE SW HOTEL, LLC AND LTS                    APPELLANTS
HOSPITALITY MANAGEMENT, LLC


                    ON REVIEW FROM COURT OF APPEALS
V.              CASE NOS. 2017-CA-0856 & NO. 2017-CA-0884
                JEFFERSON CIRCUIT COURT NO. 14-CI-003303


CHARLESTINE LINDSEY, INDIVIDUALLY;                    APPELLEES
CHARLESTINE LINDSEY, AS
ADMINISTRATRIX OF THE ESTATE OF
CHANCE BROOKS, A MINOR AND STEVEN
BROOKS, JR.


**OPINION OF THE COURT BY JUSTICE LAMBERT**

**<u>AFFIRMING IN PART AND REVERSING IN PART</u>**

Appellants, Charlestine Lindsey (Lindsey), individually and the administrator of the estate of Chance Brooks (the Estate), and Chance's father Steven Brooks Jr, individually, commenced this action against Louisville SW Hotel and LTS Hospitality Management, LLC (Comfort Inn), for wrongful death after Chance tragically drowned in a hotel pool. Each party appealed.

Comfort Inn seeks review of the punitive damages awarded by the jury, arguing that the Estate failed to meet its burden of proof. In the alternative, Comfort Inn argues that the punitive damages should be further remitted and calculated using the compensatory damages assessed to the hotel after

apportionment of fault. Comfort Inn challenges the Court of Appeals' holding that a limited retrial on the compensatory damages of loss of future earning potential, pain and suffering, and loss of consortium is required.

Following our review of the record and applicable law, we affirm in part and reverse in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2014, Lindsey took five children, including her five-year old son Chance Brooks (Chance), to Comfort Inn on Dixie Highway in Louisville, Kentucky. She and the children met her cousin—who was accompanied by five other children—at the hotel to celebrate a birthday. Despite the fact that none of the children were able to swim, Lindsey and her cousin took the children to play in the hotel's indoor pool. Lindsey instructed the younger children, including Chance, to remain in the shallow end of the pool.

Several other groups were hosting parties by the pool that day, so both the pool itself and the surrounding area were crowded. The hotel posted signage informing its guests of pool occupancy limits, but no lifeguard was present. Under hotel policy, the front desk clerk was responsible for monitoring the pool via a video display on a monitor behind the front desk. The monitor showed sixteen separate video feeds, one of which provided a partially obstructed view of the pool area.

At some point during the party, Lindsey's cousin returned to her room, with a six month old infant, while Lindsey remained in the pool area to supervise the other nine children. Lindsey sat in a hot tub adjacent to the pool

2

with three of the younger children. The remaining children continued to play in the pool. At some point, Chance exited the shallow end of the pool, walked along the deck of the pool, and entered the deep end. Chance immediately struggled to stay afloat and remained in distress for nearly two minutes before he went under the water.

Tragically, no one noticed Chance's distress. Moments after Chance went under, Lindsey gathered eight of the children and went to her cousin's room. When the group arrived at the room, Lindsey realized that Chance was not with them and rushed back to the pool area. As she searched, Lindsey was initially unable to see Chance in the deeper end of the pool. Ten minutes after he went underwater, Chance was removed from the water, unconscious. Sadly, Chance never recovered and passed away two weeks later.

In the ensuing wrongful death and tort action, the Estate alleged that Comfort Inn was negligent and grossly negligent in its operation of the swimming pool and sought punitive damages. The Estate argued that the cloudiness of the pool water prevented Lindsey or any other passersby to notice that Chance had gone underwater. The Estate claimed that the cloudiness stemmed from a pattern and practice of Comfort Inn's failure to operate its pool in compliance with applicable health department regulations.

After years of discovery, the matter was tried in 2017. At the close of all the evidence, Comfort Inn moved for a directed verdict on the issue of punitive damages. Comfort Inn argued that, even if its conduct constituted ordinary

negligence, said conduct did not warrant punitive damages. Noting that the decision was a "close call," the trial court overruled the motion and instructed the jury on punitive damages. The jury ultimately found both Lindsey and Comfort Inn liable in Chance's death, assigning 65% of the fault to Lindsey and 35% to Comfort Inn. The jury awarded compensatory damages for medical expenses and funeral expenses, totaling, $211,770.25, or $74,119.59 after apportionment. For physical pain and suffering, impairment of future earning power, and loss of consortium for Chance's mother and father, the jury awarded no damages. Notwithstanding the fact that it found Comfort Inn to be less liable than Lindsey, the jury found the hotel acted with gross negligence and awarded $3,000,000 in punitive damages.

The Estate and Comfort Inn both sought post-trial relief. The hotel moved for judgment notwithstanding the verdict (JNOV), asserting that the punitive damages award was not supported by clear and convincing evidence and violated due process. In the alternative, Comfort Inn argued that either remittitur or a new trial was necessary given the discrepancy between compensatory and punitive damages. The Estate moved for a new trial solely on the elements of compensatory damages for which the jury provided no monetary award. The circuit court overruled Comfort Inn's JNOV motion and the Estate's motion for a new trial but granted remittitur as to the punitive damages element of the award. The court concluded that a 5-1 ratio between punitive and compensatory damages was appropriate. It then applied that

4

multiplier to the entire, pre-apportionment compensatory damages award, and reduced the punitive damage award to $1,058,851.25.

Both parties appealed. Comfort Inn sought reversal of the trial court's order denying its motions for directed verdict and JNOV on the punitive damages claim. The hotel alternatively argued that the punitive damage award, if left intact, should be further reduced. The trial court erred, Comfort Inn asserted, by utilizing an impermissibly high ratio in remitting the punitive damage award and by applying that ratio to the total compensatory damage award rather than the damages actually imposed after the apportionment of fault. The Estate cross-appealed, again seeking a new trial solely on the elements of compensatory damages for which the jury awarded nothing. The Estate further argued that any review of the remittitur should be reserved until after retrial. The Court of Appeals rejected Comfort Inn's arguments concerning punitive damages but granted the Estate's request for a new trial.[1] The Court of Appeals instructed that retrial should be limited to the elements of compensatory damages for which the jury awarded $0, and that the trial court should thereafter reconsider the punitive damages award.[2]

Comfort Inn subsequently filed a Petition for Rehearing and Modification, urging the Court of Appeals to remand the case for a retrial on all elements of

---

[1] *Louisville SW Hotel, LLC v. Lindsey*, 2017-CA-000856-MR, 2019 WL 2147355 (Ky. App. May 17, 2019).

[2] *Id.* at *14.

damages. The Court of Appeals declined to modify its opinion. Comfort Inn now seeks review of the Court of Appeals' opinion. Comfort Inn asks this Court to consider whether clear and convincing evidence supported the Estate's punitive damage claim. Even if the evidence supports such a claim, Comfort Inn urges us to hold (1) the ratio upheld by the circuit court violates due process, and (2) any punitive damage award must be calculated using the post-apportionment compensatory damages award. Finally, Comfort Inn asks us to conclude that the Court of Appeals erred in remanding the case for a new trial on the three compensatory damage categories.

## II. ANALYSIS

### A. The trial court did not err in instructing the jury on punitive damages.

Comfort Inn contends that the trial court incorrectly denied its motions for directed verdict and JNOV on the punitive damage claim. Comfort Inn argues that the Estate failed to demonstrate that it acted with gross negligence by clear and convincing evidence. In light of the degree of deference we must show to the trial court, we cannot conclude that the court clearly erred.

An appellate court, when reviewing a trial court's decision to deny a motion for directed verdict, must determine whether the jury's verdict is so palpably "against the evidence so as to indicate that it was reached as the result of passion or prejudice."[3] In the making that determination, an appellate court must consider the evidence in a light most favorable to the

---

[3] *Osborne v. Keeney,* 399 S.W.3d 1, 8 (Ky. 2012).

prevailing party.[4] All reasonable inferences from the evidence must be resolved in favor of the prevailing party, and the reviewing court must not independently assess the credibility or weight of the evidence presented.[5] Ultimately, the appellate court cannot substitute its own judgment for that of the lower court unless the latter clearly erred.[6]

A party seeking punitive damages in a wrongful death cause of action must show that the defendant acted willfully or with gross negligence.[7] To demonstrate gross negligence, a party must first show that the defendant failed to exercise reasonable care and then show "that [the] negligence was accompanied by wanton or reckless disregard for the lives, safety or property of others."[8] Multiple acts of negligence, each of which—if considered in isolation—might not support a finding of wantonness, may support a finding of gross negligence when considered alongside one another.[9] Given the severity of the sanction, a party seeking punitive damages must establish gross negligence through clear and convincing evidence.[10]

---

[4] *See id.*

[5] *Id.*

[6] *Bierman v. Klapheke*, 967 S.W.2d 16, 18-19 (Ky. 1998).

[7] *See* Kentucky Revised Statute (KRS) 411.130(2).

[8] *Gibson v. Fuel Transp., Inc.*, 410 S.W.3d 56, 59 (Ky. 2013) (quoting *Horton v. Union Light, Heat and Power Co.*, 690 S.W.2d 382, 389-90 (Ky. 1985)).

[9] *See Horton*, 690 S.W.2d at 388 ("[A] single act of negligence might not constitute gross negligence, gross negligence may result from the several acts.").

[10] KRS 411.184(2).

The Estate argues that Chance's death was the result of a years-long pattern of Comfort Inn's failure to properly maintain and monitor its indoor pool. The evidence presented at trial may be generally divided into two categories: (1) evidence concerning the cloudiness of the pool water, and (2) evidence concerning Comfort Inn's failure to employ sufficient staff. Under the Estate's theory, the cloudiness of the water in addition to the crowdedness of the pool area and lack of staff created a scenario in which potential rescuers failed to notice Chance's distress until it was too late.

The Estate introduced into evidence several reports of the Louisville Metro Health Department indicating that Comfort Inn failed to test and log the chemical levels in the pool with the regularity required by health department regulations. A significant majority of these violations occurred between 2010 and 2012, at least two years prior to Chance's death. The jury heard testimony from Tim Wilder, an employee of the Louisville Metro Health Department. Wilder testified that the purpose of frequent testing and logging is to ensure that pool water remains sanitary and clear throughout the day. Although the hotel had not received a citation for improper chemical testing within ten months of the incident, its testing log for the week of incident showed that Comfort Inn staff failed to assess the chemical levels in the pool with the frequency required by regulation. Randy Murdock, Comfort Inn's general manager, testified that he noticed the water's cloudiness when inspecting the pool hours after the incident.

8

The jury also heard testimony concerning Comfort Inn's management of the pool room. First, evidence in the record suggested that Comfort Inn did not employ any pool maintenance personnel in the months leading up to Chance's death. Second, the Estate presented testimony that the pool's occupancy limits were not being enforced on the day of the incident. Pursuant to the "2-5 rule," no fewer than two but no more than five bathers could be in the pool at one time unless a qualified attendant or lifeguard was present. On the day of the incident, surveillance footage and witness testimony demonstrated that more than five bathers were present in the pool throughout the day. In spite of this, no attendant or lifeguard monitored the pool in person on the day of the incident. Instead, the front desk clerk was responsible for keeping an eye on a video feed of the pool area while performing his other duties. At trial, the front desk clerk testified that he did not know how many bathers were in the pool when Chance drowned.

Comfort Inn offers two responses. First, it asserts that the Estate fails to demonstrate how its violations of health department regulations and the occupancy limit actually caused Chance's death. Second, it claims that, even if its conduct warrants a finding of ordinary negligence, its actions were not so reprehensible as to warrant punitive damages. On the week of the incident, Comfort Inn did test the pool's chemical levels and ensured its filtration system worked properly. Essentially, Comfort Inn argues that its partial compliance with regulations demonstrates at least slight care, thereby precluding a finding of "reckless indifference."

Our inquiry, however, requires us to abstain from supplanting our independent judgment for that of the trial court absent clear error. And in this case, considering the record in a light most favorable to the prevailing party, we hold that sufficient evidence supported the trial court's decision to instruct the jury on punitive damages. The Estate introduced evidence that Comfort Inn failed to comply with health department regulations and its own occupancy policy on the day of the incident. Moreover, the record demonstrates that Comfort Inn was regularly out of compliance with the testing and logging regulations of the applicable health code. Testimony at trial suggested that these violations were never communicated by hotel management to staff. The jury could draw a reasonable inference that Comfort Inn's conduct demonstrated an indifference to the goings-on of its indoor pool. In turn, the jury could reasonably conclude that this indifference created a condition in which—due to a combination of cloudy water, crowdedness, and the absence of a lifeguard—Chance's struggles went unnoticed. We are accordingly unable to conclude that the Estate failed to meet its burden of proof regarding punitive damages.

## B. A limited retrial on the compensatory damages of loss of future earning potential, pain and suffering, and loss of consortium is improper.

Comfort Inn next argues that the Court of Appeals erred by ordering a limited retrial on the compensatory damages of loss of future earning potential, pain and suffering, and loss of consortium.

Our rules of procedure allow a trial court to grant a new trial if a damage award appears "to have been given under the influence of passion or prejudice

or in disregard of the evidence or instructions of the court."[11]  On appeal, the reviewing court must accord the decision of the trial court significant deference and, therefore, may reverse only upon a showing of clear error.[12]  With this in mind, we now address the arguments surrounding each of these damage awards in turn.

### (1) Loss of Future Earning Potential

The Court of Appeals held that *Turfway Park Racing Ass'n v. Griffin*[13] precluded a zero-dollar damage award for the loss of Chance's future earning potential, as he was "a healthy five-year-old boy with no indication of any disability that would prevent him from earning wages in his life."[14]

In *Turfway*, a four-year-old child fell to his death from a stairway at Turfway Park.[15]  The child's mother brought a wrongful death suit against Turfway Park on behalf of his estate.[16]  The jury awarded damages to the estate totaling $62,831.27 for medical expenses, funeral expenses, and pain and suffering from the time of the injury until death, the majority of which was awarded for pain and suffering.[17]  However, the jury awarded $0.00 for the destruction of the child's future earning potential.[18]  The estate appealed,

---

[11] Kentucky Rules of Civil Procedure (CR) 59.01(d).

[12] *Bayless v. Boyer*, 180 S.W.3d 439, 444 (Ky. 2005).

[13] 834 S.W.2d 667 (Ky. 1992).

[14] *Lindsey*, 2019 WL 2147355, at *11.

[15] 834 S.W.2d at 668.

[16] *Id*. at 668-69.

[17] *Id*. at 669.

[18] *Id*.

arguing that the award was inadequate and inconsistent with the evidence offered by their economist who gave the jury a range of damages between 1 million and 3.1 million for loss of future earning potential.[19]

The Court of Appeals reversed.[20] Relying on *Rice v. Rizk*,[21] a wrongful death case concerning the death of an infant, the Court of Appeals held that "the inference of some loss of earning power was sufficient to require an award of damages."[22] Turfway then appealed to this Court, and we granted discretionary review "to determine whether a jury verdict of zero for destruction of a child's power was inadequate[.]"[23]

The *Turfway* Court also found *Rice v. Rizk*'s discussion of the rules for ascertaining damages in a wrongful death case to be significant.[24] In particular, it quoted the following:

> [l]ack of proof of the decedent infant Rice's power will not preclude recovery for the wrongful, negligent destruction of the infant's power to earn money. To require such proof would be to deny damages in the instant case, as well as in all similar wrongful, negligent death cases involving infants. There is an *inference* that the child would have had some earning power, and in this lies the basis for recovery.[25]

---

[19] *Id.* at 669-70.

[20] *Id.* at 669.

[21] 453 S.W.2d 732 (Ky. 1970).

[22] *Turfway*, 834 S.W.2d at 669.

[23] *Id.* at 668.

[24] *Id.* at 671.

[25] *Id.* (quoting *Rice,* 453 S.W.2d at 735).

12

Seizing on the foregoing language that there was "an inference" the child would have had some earning power, the *Turfway* Court upheld the Court of Appeals' reversal on the grounds that an award of zero dollars for the loss of the child's future earning potential was inappropriate.[26]  The Court reasoned that "damages flow naturally from the wrongful death of a person unless there is evidence from which the jury could reasonably believe that the decedent possessed no power to earn money."[27]  And, in the case before it, "there was no evidence that the decedent was other than a normal four-year-old boy and certainly no evidence of a disability so profound as to render him incapable of earning money upon reaching adulthood."[28]  It therefore remanded for a limited retrial on the issue of the child's loss of future earning potential.[29]

Comfort Inn's sole argument against the application of *Turfway* to this case is that the facts are distinguishable in that comparative fault was not an issue in *Turfway*.  However, addressing that argument is unnecessary.  Upon reflection, we conclude that *Turfway* is an anomaly in our jurisprudence and hereby overrule it insofar as it prevents a jury from awarding zero dollars for loss of future earning potential.  Therefore, while the Court of Appeals properly applied the precedent of *Turfway*, we nevertheless reverse its holding that a limited retrial on Chance's loss of future earning potential is needed.

---

[26] *Turfway*, 834 S.W.2d at 671.

[27] *Id.*

[28] *Id.*

[29] *Id.*

13

Put simply, the loss of future earning potential for a deceased child in a wrongful death case is the *only* category of compensatory damages for which we have stripped our juries of their discretion to choose whether to award damages. Stated differently, it is the only category of damages for which the jury is not free to enter a verdict of zero dollars. We can no longer find a logical basis for this distinctive treatment for this element of damages. Our civil justice system engages juries to contend with fact-intensive determinations such as whether to award damages and what the amount of those damages should be. And those decisions are entitled to a great deal of deference. As such, and as with all other compensatory damages, it should be squarely within a jury's discretion whether to award damages for a decedent child's loss of future earning potential.

Consequently, we hold that there was no error in the jury's failure to award damages for loss of future earning potential in this case. The evidence at trial included testimony by a vocational economics expert on behalf of the estate that estimated Chance's lifetime earning capacity to be between $1,890,874, and $3,770,805. Notwithstanding, after five hours of deliberation, the jury awarded the full amounts sought for medical expenses ($205,579.25) and for funeral and burial expenses ($6,191.00), and $0.00 for each of the four remaining items of claimed compensatory damages: pain and suffering, loss of future earning potential, and the loss of consortium for his mother and father, respectively.

The lack of award for loss of future earning potential was reviewed by the trial court, and although it focused its analysis primarily on *Turfway*, it also reasoned that "[i]t is also possible that the Jury believed that if Chance Brooks had survived, he would have suffered brain damage, depriving him of the power to labor and earn money." Therefore, it reasoned, "[b]ecause there was at least some evidence that supports the Jury's verdict, the verdict regarding the loss of power to labor and earn money will not be disturbed." We cannot hold the trial court clearly erred on this front.

### (2) Pain and Suffering

Comfort Inn further disputes the Court of Appeals reversal of the trial court's ruling that upheld the jury's award of $0 for pain and suffering.[30] The Court of Appeals held that the verdict was not supported by the evidence presented at trial.[31] However, our case law does not support that conclusion. We accordingly reverse the Court of Appeals, and hold that the trial court properly denied the motion for a new trial.

A jury verdict of zero for pain and suffering is not inadequate as a matter of law even if the jury also awards damages for medical expenses.[32] A party seeking damages must establish by "substantial evidence" that pain and suffering occurred.[33] In its decision below, the Court of Appeals examined

---

[30] *Lindsey*, 2019 WL 2147355, at *12.

[31] *Id.* at *12.

[32] *Bayless*, 180 S.W.3d at 444.

[33] *Worldwide Equip., Inc. v. Mullins*, 11 S.W.3d 50, 61 (Ky. App. 1999).

multiple cases from other jurisdictions holding that pain and suffering damages are recoverable in cases involving drowning.[34]  The court then considered the testimony of Dr. Jerome Modell, a drowning expert who testified on the estate's behalf.[35]  Dr. Modell testified that drowning victims suffer great pain during the time in which they are conscious.[36]  The court then analyzed the surveillance video depicting Chance's death in context of Dr. Modell's testimony, concluding that Chance clearly suffered pain.[37]

In doing so, however, the Court of Appeals substituted its independent judgment for that of the jury and the trial court.  The jury saw the surveillance video, heard Dr. Modell's testimony, and knew they were permitted to award damages for pain and suffering.  They chose not to.  Pain and suffering damages are not presumed in wrongful death cases.[38]  As such, the jury was not required to award damages for pain and suffering.  Nor were they required to accept Dr. Modell's testimony.  Thus, the jury reached a decision they were entitled to reach and the trial court did not clearly err in denying the motion for a new trial on this basis.[39]

---

[34] *Lindsey*, 2019 WL 2147355, at *12.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *See Bayless*, 180 S.W.3d at 444.

[39] To be clear, we do not quarrel with the Court of Appeals' conclusion that a pain and suffering damage award may be appropriate in drowning cases generally.  We reverse the Court of Appeals solely on the grounds that *this jury* was not required to draw such a conclusion.

16

### (3) Loss of Consortium

The Court of Appeals also granted a new trial based on the jury's failure to award loss of consortium damages.[40]  The court held, as a matter of first impression that, under a *Turfway*-esque reasoning, an award of zero is insufficient in a wrongful death case involving the death of a child.[41]  The Court of Appeals did not cite any binding authority to support its ruling, but utilized a case from the Supreme Court of Nebraska.[42]

In *Estate of Brandon*, Nebraska's highest court held that a new trial was required after the jury returned a zero-damage award for the parents' loss of the child's society, comfort, and companionship.[43]  The Court emphasized that the death of a child destroys the parents' investment of "money, affection, guidance, security, and love" in that child.[44]  The destruction of this investment, alongside "the intrinsic value" of the parent-child relationship, entitled parents to at least some damages for loss of consortium in a wrongful death case.[45]

Although we agree that the parent-child relationship possesses an intrinsic value (one likely beyond measure) we cannot conclude that establishing a *Turfway*-like presumption for such damages best effectuates the

---

[40] *Lindsey*, 2019 WL 2147355, at *14.

[41] *Id*. at *13.

[42] *Id*.

[43] *Brandon ex rel. Estate of Brandon v. County of Richardson*, 261 Neb. 636, 624 N.W.2d 604 (2001).

[44] *Estate of Brandon*, 624 N.W.2d at 626.

[45] *Id*.

role of the jury in the litigation process. Loss of consortium, like pain and suffering and future earning potential, does not lend itself to simple quantification. The entire inquiry rests on a speculative premise: the value of the decedent's affection. While everyone would agree that the loss of a child is tragic, not everyone would be able to agree on a monetary value for that loss. In light of the speculative nature of this inquiry, this Court's creation of a presumption—absent any authority in support of such a rule—may pose too significant an intervention into the jury's deliberative function. Therefore, we decline to adopt such a holding and reverse the Court of Appeals.

## C. The trial court did not err in its calculation of the remittitur of the punitive damages.

Finally, Comfort Inn raises two issues concerning the trial court's calculation of the remittitur of the punitive damages award. First, it asserts that the 5-1 ratio applied to reduce the punitive damage award was inappropriate. Second, it asserts that the trial court should have applied that ratio to the post-apportionment compensatory damages award, rather than the pre-apportionment amount. We address each argument in turn.

First, Comfort Inn asserts that the 5-1 ratio utilized by the trial court was excessive under *BMW of North America v. Gore*.[46] The trial court reached its decision to apply a 5-1 ratio based on the following analysis from its order regarding Comfort Inn's request for remittitur:

> [t]he Defendant next argued that the punitive damages award is unconstitutional and should be set aside. The Supreme Court of

---

[46] 517 U.S. 559 (1996).

18

the United States established three guideposts for courts to consider when reviewing the constitutionality of a punitive damage award: 1) the degree of reprehensibility of the defendant's conduct; 2) the disparity between the harm or potential harm suffered by the plaintiff and the punitive damages award; and 3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Gore*, 517 U.S. at 575.

First, the Court must consider the degree of reprehensibility of the Defendants' conduct . . . The harm in this case was physical and resulted in a death. There is also evidence that the conduct evinced indifference or a reckless disregard for the health and

safety of others, and that the failure to maintain the pool was not an isolated event. Therefore, the Court concludes that the degree of reprehensibility of the Defendant's actions could be high enough to satisfy the first factor in *Gore*.

Second, the Court must consider the disparity between the harm suffered by the plaintiff and the punitive damages award. The Court must review whether the award was so grossly excessive as to violate due process...[T]he Plaintiffs received $74,119.59 in compensatory damages. The Jury awarded $3,000,000.00 in punitive damages, which would make the ratio between punitive and apportioned compensatory damages 41:1. The Plaintiffs have argued that the Court should use the entire amount of compensatory damages before apportionment to calculate the ratio. If the $211,770.25 damage figure is used, then the ratio becomes 14:1 . . . The Court finds in light of a child death in this case, that the degree of harm caused and not purely the economic figure ultimately received should control.

The issue before the Court is whether a compensatory/punitive damages ratio of 41:1 or 14:1 is unconstitutional. The Court finds the award is excessive . . . In *Pacific Mutual Life Insurance Co. v. Haslip*, the Supreme Court held that punitive damages of more than four times the amount in compensatory damages did "not cross the line into the area of constitutional impropriety," but it might be close. 499 U.S. 1, 23-24 (1991) . . . Several years later in *Gore*, the Supreme Court favored a ratio of not more than 10:1, but stated that low compensatory damage awards may support a higher ratio if "a particularly egregious act has resulted in only a small amount of economic damages." *Gore*, 517 U.S. at 582. The Supreme Court later stated in [*State Farm Mutual Automobile*

19

*Insurance Co. v. Campbell*] that "single-digit multipliers are more likely to comport with due process" and "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." [538 U.S. 408, 425 (2003)].

[...]

[W]hile this Court notes that higher courts have not established a bright-line rule or mathematical formula for punitive damages, their holdings consistently indicate that ratios of no more than 10:1 are constitutional and only in exceptional circumstances will awards exceeding this ratio satisfy due process. Here, the court does not find any exceptional circumstances or particularly egregious conduct to justify an extraordinary ratio[. . .]

Finally, the Court must consider the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. As stated by the Defendants, the only possible penalty for any of the Defendants' actions is a $100 fine for allowing more than five people in the pool when an attendant is not present. This fine is dwarfed be the $3 million punitive damages award, causing this factor to weigh against upholding the award.

Based on the above analysis, the Court finds that there was some support for an award of punitive damages and the entire award will not be set aside . . . Rather than the current ratio, the Court concludes that a 5:1 ratio is more appropriate and in line with Supreme Court rulings.

Based on the trial court's reasoning, we hold that its decision to use a 5-1 ratio was not inappropriate or inconsistent with due process or settled case law.

Next, Comfort Inn asserts that the trial court should have applied that 5-1 ratio to the post-apportionment amount of compensatory damages ($74,119.58) instead of the pre-apportionment amount ($211,770.25). The application of comparative fault to the analysis of punitive damages appears to be an issue of first impression in Kentucky. Our review of other jurisdictions'

20

approach to the issue reveals a consistent principle: the majority of states do not consider comparative fault in their analysis of punitive damages.[47] The common argument in each of these decisions is that comparative fault regimes and punitive damages advance different aims.[48] The purpose of comparative negligence is to allocate compensatory damages in "direct proportion to fault."[49] Punitive damages, in addition to providing additional compensation to a tort victim, foster the state's interest in punishment and deterrence.[50] Keeping this distinction in mind, we concur with the majority approach: where a party's wrongful acts merit the award of punitive damages alongside compensatory damages, that party's comparative fault is only relevant to the determination of the compensatory damages.

Comfort Inn, in an attempt to distinguish this case from the majority trend, argues that comparative fault principles should apply because it was determined to be less culpable than the Estate. We acknowledge the uniqueness of a verdict that simultaneously determines a party to be a

---

[47] *See e.g.*, *Clark v. Cantrell*, 529 S.E.2d 528 (S.C. 2000); *Bowman v. Doherty*, 686 P.2d 112, 122 (Kan. 1984); *Shahrokhfar v. State Farm Mutual Auto. Ins. Co.*, 634 P.2d 65, 659 (Mont. 1981); *see also* Francis M. Doughtery, Annotation, *Effect of Plaintiff's Comparative Negligence in Reducing Punitive Damages Recoverable*, 27 A.L.R.4th 318 (1984).

[48] *See e.g.*, *Bowman*, 686 P.2d at 122 ("An award of punitive damages is to punish the wrongdoer, not to compensate for the wrong. Comparative negligence focuses on the harm suffered and proportionate fault of all the parties to the occurrence. Considerations are different in assessing punitive damages from those assuring the injured party proper compensation.").

[49] *Hilen v. Hays*, 673 S.W.2d 713 (Ky. 1984).

[50] *See Gore*, 517 U.S. at 568 ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition.").

minority tortfeasor and imposes punitive damages on the same party.  But one rare example does not a general rule make.

Consider a scenario where a party acts in a manner that all reasonable persons would agree to be reprehensible enough to warrant punitive damages. Now assume that, due to the presence of the negligent acts of other persons or entities, it is difficult to establish the extent to which the party's conduct caused the plaintiff's injuries.  Under our comparative fault statute, the jury must consider both the character of the parties' conduct and causation in allocating fault.[51]  Under this approach, the jury could reasonably determine that the party—despite the severity of its actions—bears a minority of the overall fault due to the attenuated relationship between its conduct and the harm suffered by the plaintiff.  It might be reasonable for the jury to also award punitive damages to discourage future wrongful conduct.  In such a case, the application of comparative fault principles to reduce compensatory damages makes sense because it matches the damages awarded to the harm caused. However, the application of those principles to the punitive damage award may inhibit the deterrent effect of that award.  Put simply, the two concepts— comparative fault and punitive damages—seek different ends.  We thus hold that a reviewing court must assess the adequacy of a punitive damage award

---

[51] KRS 411.182 (1)("The trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.").

22

by reference to the gross compensatory damage award without application of comparative fault.

### III. CONCLUSION

To be clear, while we are reversing the Court of Appeals in part and reversing in part, the trial court judgments are affirmed in full.

All sitting. Minton, C.J.; Conley, Hughes, Lambert and VanMeter, JJ., concur. Keller, J., concurs in result only. Nickell, J., concurs in part and dissents in part, writing separately.

Nickell, J., Concurring In Part and Dissenting In Part: Respectfully, I concur in part and dissent in part. While I agree with much of the majority's analysis, I cannot agree with that portion of the majority opinion which overturns *Turfway*. With little analysis, the majority sweeps away a thirty-year-old precedent as an "anomaly in our jurisprudence." Contrary to the majority's conclusion, I do not believe *Turfway* is an outlier but rather was a decision based on sound logic which endures today.

> The measure of damages in wrongful death actions in Kentucky is the value of the destruction of the power of the decedent to earn money, not the destruction of income from a particular job or occupation. The award in such a case is not limited to the past earnings of the decedent, as they may not be indicative of his power to earn. Under this rule, there is necessarily an element of speculation involved in determining the power to earn money, particularly in the case of children and others who have not established a history of earnings. Yet the Kentucky courts have consistently upheld verdicts in such cases in the face of argument that they are based on speculation.

*Adams v. Davis*, 578 S.W.2d 899, 902 (Ky. App. 1979) (internal citations omitted). "[D]amages flow naturally from the wrongful death of a person unless

23

there is evidence from which the jury could reasonably believe that the decedent possessed no power to earn money." *Turfway*, 834 S.W.2d at 671. "Evidence of past earnings is not always a prerequisite for an award for loss of future earnings." *Pickard Chrysler, Inc. v. Sizemore*, 918 S.W.2d 736, 739 (Ky. App. 1995).

Here, as in *Turfway*, "there was no evidence that the decedent was other than a normal [five]-year-old boy and certainly no evidence of a disability so profound as to render him incapable of earning money upon reaching adulthood." 834 S.W.2d at 671. "The death of a person results in an irrevocable cessation of possibility[.]" *Id.* at 670. The Estate produced evidence from a vocational economics expert who opined Chance's lifetime earnings would fall between $1,890,874 and $3,777,805. Comfort Inn produced no evidence to the contrary. As such, the jury's award of $0 for future earnings was manifestly against the weight of the evidence. This is the exact scenario envisioned by *Turfway* which, as previously stated, I believe was rightfully decided. I would uphold *Turfway* and remand to the trial court for a new trial in which the jury was instructed to award some measure of damages for the loss of future earning potential.

24

COUNSEL FOR APPELLANT:

Diane Murphy Laughlin
Blackburn Domene & Burchett, PLLC

COUNSEL FOR APPELLEE:

Garry Richard Adams, Jr.
Andrew Thomas Lay
Adams Landewich Walton, PLLC

COUNSEL FOR AMICUS CURIAE, KENTUCKY DEFENSE COUNSEL, INC.

Griffin Terry Sumner
Jeremiah A. Byrne
Frost Brown Todd, LLC